John LISI, etc., et al., Appellees,

v.

**ALITALIA–LINEE AEREE ITALIANE, S. p. A., Appellant.**

**Nos. 91–95, Dockets 30543–30547.**

United States Court of Appeals
Second Circuit.

Argued Oct. 26, 1966.

Decided Dec. 16, 1966.

George N. Tompkins, Jr., New York City (Austin P. Magner, Condon & Forsyth, New York City, on the brief), for appellant.

Theodore E. Wolcott, New York City (Alfred W. Gans, New York City, on the brief), for appellees.

Before LUMBARD, Chief Judge, MOORE and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The question presented on this appeal is whether Alitalia's liability, arising from the crash of one of its planes, is limited by the provisions of the so-called Warsaw Convention.[1]

On February 26, 1960, while en route from Rome to New York, Alitalia's airplane crashed shortly after taking off from Shannon, Ireland. Five suits were brought and consolidated in the District Court for wrongful death, personal injuries and property damage, allegedly suffered by thirteen of the passengers aboard the craft at the time of the disaster. The appellees are citizens of New York, while appellant is an Italian corporation. Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332 (a) (2).

In answering the complaints, Alitalia pleaded as affirmative defenses those Articles of the Convention which serve to exclude or limit an airline's liability to its passengers. Prior to trial, the appellees

moved for a partial summary judgment to dismiss these affirmative defenses, asserting that they were not available because appellant had failed properly to notify the passengers of the applicability of the Convention. Judge MacMahon agreed with appellees and granted their motion. He also stayed the trial pending decision by us "on the controlling question of whether the challenged affirmative defenses are available to defendant [Alitalia] in the light of the facts shown here." 253 F.Supp. 237, 243 (S.D.N.Y. 1966). This Court granted appellant's application for leave to appeal pursuant to 28 U.S.C. § 1292(b).[2]

## I.

■ It is conceded that the flight in question meets the definition of "international transportation" contained in Article 1 of the Convention.[3] Therefore, the provisions of the Convention quite properly govern the present action. See Eck v. United Arab Airlines, 360 F.2d 804, 808 (2d Cir. 1966).

Alitalia's main argument can be stated quite simply. Under Articles 17 and 18 of the Convention, 49 Stat. 3018–3019, the carrier is liable for the death or bodily injuries suffered by passengers while on board its aircraft, and for destruction or loss of checked baggage.

1. 49 Stat. 3000–3026. The official title is "Convention for the Unification of Certain Rules Relating to International Transportation by Air," hereinafter referred to as "Convention."

The Convention was concluded at Warsaw, Poland, on October 12, 1929, and proclaimed by President Roosevelt on October 29, 1934. *Over ninety countries* have become signatories to the Convention.

2. "(b) When a district judge, in making in a civil action an order not otherwise *appealable under this section*, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may there-

upon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however*, That application shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order."

3. "(1) This convention shall apply to all international transportation of persons, baggage, or goods performed by aircraft for hire. * * *

"(2) For the purposes of this convention the expression 'international transportation' shall mean any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the transportation or a transshipment, are situated within the territories of two High Contracting Parties * * *." 49 Stat. 3014.

But, this liability, it says, is limited by Article 22, 49 Stat. 3019, which provides:

(1) In the transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of 125,000 francs [approximately $8300]. * * * Nevertheless, by special contract, the carrier and the passenger may agree to a higher limit of liability.[4]

(2) In the transportation of checked baggage and of goods, the liability of the carrier shall be limited to a sum of 250 francs [approximately $17] per kilogram, unless the consignor has made, at the time when the package was handed over to the carrier, a special declaration of the value at delivery and has paid a supplementary sum if the case so requires. * * *

(3) As regards objects of which the passenger takes charge himself the liability of the carrier shall be limited to 5,000 francs [approximately $332] per passenger.

It is clear, however, that under other Articles of the Convention, these limitations on liability are not applicable if the carrier fails to deliver to the passenger a ticket or a check for baggage.[5] These Articles, moreover, provide that the ticket and check shall contain certain specified information, including "a statement that the transportation is subject to the rules relating to liability established by this convention."[6] Thus, it would appear, that unless the carrier furnishes to the passenger a ticket or baggage check containing the appropriate statement, it may not restrict its liability as circumscribed by the Convention Articles.

Alitalia responds, however, by arguing that there is a crucial difference in the language between Articles 3 and 4. While Article 4(4), it says, denies the carrier limited liability "if * * * [it] accepts baggage without a baggage check having been delivered, *or if the baggage check does not contain the particulars*" specified (emphasis added), the only ground stated in Article 3(2) for denying limited liability for the personal injuries or death of passengers, is the carrier's failure to deliver a ticket. Thus, we are asked to apply the principle *expressio unius est exclusio alterius* and to hold that failure to give notice on the passenger ticket that the flight is subject to the Convention's rules, will not deprive the carrier of the substantial delimitation of liability for personal injuries or death. All that is required, urges Alitalia, for this right to vest, is that a ticket be delivered to the passengers.

## II.

It is apparent that Alitalia relies on a literal reading of the Convention for its assertions. We reject the interpretation it urges upon us. While it is true that the language of the Convention is relevant to our decision, it must not become, as Justice Frankfurter stated it, a "verbal prison." Sullivan v. Behimer, 363 U.S. 335, 358, 80 S.Ct. 1084, 4 L.Ed. 2d 1254 (1960) (Frankfurter, J., dissenting). The task of ascertaining the meaning of words is difficult, and one

---

4. Prior to the Hague Protocal of 1955 (see note 7, infra), the carrier was not liable even for this limited amount "if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures," Article 20, 49 Stat. 3019; or if "the carrier proves that the damage was caused or contributed to by negligence of the injured person [and] the court * * * in accordance with the provisions of its own law, exonerate the carrier wholly or partly from his liability." Article 21, 49 Stat. 3019.

5. "[I]f the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those provisions of this convention which exclude or limit his liability." Article 3(2), 49 Stat. 3015.

"[I]f the carrier accepts baggage without a baggage check having been delivered * * * the carrier shall not be entitled to avail himself of those provisions of the convention which exclude or limit his liability." Article 4(4), 49 Stat. 3016.

6. Article 3(1) (e), 49 Stat. 3015; Article 4(3) (h), 49 Stat. 3016.

certain way of misinterpreting them is by a literal reading. As Learned Hand put it, "words are such temperamental beings that the surest way to lose their essence to to take them at their face." 1942 Address by Judge Hand to the Massachusetts Bar Association. Thus, the language of Article 3 cannot be considered in isolation; rather, it must be viewed in light of the other Articles and the overall purposes of the Convention. See Eck v. United Arab Airlines, supra.

This is not the first occasion on which we have been called upon to interpret the language of the Convention's delimiting provisions. For example, in Mertens v. Flying Tiger Line, Inc., 341 F.2d 851 (2d Cir.), cert. denied, 382 U.S. 816, 86 S.Ct. 38, 15 L.Ed.2d 64 (1965), we were asked to decide whether presenting a ticket to a passenger after he boarded the carrier's plane, constituted a "delivery" within the meaning of Article 3(2). We stated:

> We read Article 3(2) to require that the *ticket be delivered to the passenger in such a manner as to afford him a reasonable opportunity to take measures to protect himself against the limitation of liability.* Such self-protective measures, could consist of, for example, deciding not to take the flight, entering in a special contract with the carrier, or taking out additional insurance for the flight. The Convention specifically provides that "the carrier and the passenger may agree to a higher limit of liability" (Article 22(1)) and there would be lit-

tle reason to make this provision, to require that the ticket state that the liability of the carrier is limited (Article 3(1) (e)), and to require that such a ticket be delivered to the passenger unless the Convention also required that the ticket *be delivered in such circumstances as to afford the passenger a reasonable opportunity to. take these self-protective measures.*" Id. at 856–857 (emphasis added).

We held, accordingly, that the delivery was inadequate, and the Convention's fixed limits of liability were not available.

Later, a similar result was reached by the Ninth Circuit in Warren v. Flying Tiger Line, Inc., 352 F.2d 494 (1965). There the passenger was given a "boarding ticket" or "pass" at the foot of the ramp leading to the aircraft. The Court decided that the "delivery" must be made sufficiently in advance so that the passenger will have the opportunity to take self-protective measures, such as purchasing additional insurance if he so chooses. The "delivery" of a boarding ticket at the foot of the ramp as the plane was about to depart, did not suffice therefor. The carrier, accordingly, was barred by Article 3(2) from availing itself of the Convention's liability limitation provisions.

We believe that the reasoning of the *Mertens* and *Warren* decisions is apposite to the case now before us. The Convention's arbitrary limitations on liability—which have been severely and repeatedly criticized [7]—are advantageous

---

**7.** See generally Sand, "Air Carriers' Limitations of Liability and Air Passengers' Accident Compensation Under the Warsaw Convention," 28 J. Air L. & Com. 260 (1961–62).

Criticism of the Convention's limits on liability began to crystallize in the early 1950's as a result of the impact on the public arising from a plane crash in 1943, in which the entertainer Jane Froman was seriously injured. Despite the extent of her injuries, the size of her medical bills, and the curtailment of her blossoming career, her award against Pan American was limited to $8300. Ross v. Pan American Airways, 299 N.Y. 88,

85 N.E.2d 880, 13 A.L.R.2d 319 (1949), cert. denied, sub nom. Froman v. Pan American Airways, Inc., 349 U.S. 947, 75 S.Ct. 874, 99 L.Ed.2d 1273 (1955). See Kreindler, "The Denunciation of the Warsaw Convention," 31 J. Air L. & Com. 291, 294 (1965).

In 1955, the Hague Conference was called, and from it came the so-called Hague Protocol, which would have doubled the limits on liability for personal injuries to $16,600. Although signed by the United States, it was not ratified by the Senate.

On November 15, 1965, the United States sent a Notice of Denunciation to

to the carrier. But the *quid pro quo* for this one-sided advantage is delivery to the passenger of a ticket and baggage check which give him notice that on the air trip he is about to take, the amount of recovery to him or his family in the event of a crash, is limited very substantially. Thus the passenger is given the opportunity to purchase additional flight insurance or to take such other steps for his self-protection as he sees fit.

■ This notice to passengers is especially important in this country where the overwhelming number of people who travel by air do so on domestic flights, for which the Convention's restrictions on liability are inapplicable. It is too much to expect these passengers to be sufficiently sophisticated to realize that although they are traveling the same number of miles on an international flight that they have frequently traveled domestically, the amount they may recover in the event of an accident is dras-

tically reduced. In short, it is clear from the *ratio decidendi* of the *Mertens* and *Warren* cases, that the inquiry that must be made if the Convention's Articles are to be given meaning, is "[w]hether the ticket was delivered to the passenger in such a manner as to afford him a reasonable opportunity to take self-protective measures * * *." *Mertens v. Flying Tiger Line, Inc.,* supra, 341 F.2d at 857.[8]

### III.

■ We proceed to determine, therefore, whether the particular tickets and baggage checks involved in the present case gave the appellees adequate notice.[9] On the front of the ticket and baggage check, in exceedingly small print, was the following message: "Each passenger should carefully examine this ticket, particularly the Conditions on page 4." And, at this point, we note that one of our reasons in Mertens v. Flying Tiger Line, Inc., supra, for precluding the car-

the Polish Government stating that this country opposed the Convention's low limits on liability for personal injuries, and would withdraw from the Convention at the end of six months, pursuant to Article 39, 49 Stat. 3022. Id. at 303. The State Department made it known, however, that the denunciation would be withdrawn if the world's international air carriers agreed to raise the limitation first to $75,000 and ultimately to $100,000. An interim agreement was reached among the carriers, including Alitalia, in the Spring of 1966, providing for limits of liability of $58,000 plus costs of litigation, or $75,000 inclusive of costs of litigation, under conditions of absolute liability. On May 14, 1966, the United States withdrew its previous "Notice of Denunciation." See "The Warsaw Convention—Recent Developments and the Withdrawal of the United States Denunciation," 32 J. Air L. & Com., No. 2, p. 243 (1966).

8. Alitalia's reliance on Grey v. American Airlines, 227 F.2d 282 (2d Cir. 1955), cert. denied, 350 U.S. 989, 76 S.Ct. 476, 100 L.Ed. 855 (1956), is misplaced. In that case defendant's plane, while enroute from New York to Mexico City, crashed near Dallas. Although the flight was scheduled to make stops at Washington, D. C. and Dallas, this information was not contained on the ticket given to the plaintiffs, despite the provision in Article

3 of the Convention that all "agreed stopping places" shall be listed. Plaintiffs claimed that because of this omission, defendant was precluded from claiming limited liability under the Convention. Plaintiffs' motion to strike the carrier's defenses based on the Convention was denied by the district court, 95 F.Supp. 756 (S.D.N.Y.1950), and we affirmed, finding that the motion was based on a "technical and wholly unsubstantial alleged omission". 227 F.2d at 284.

Our decision in *Grey* is perfectly consistent with the holdings in *Mertens* and *Warren,* supra. In *Grey,* the plaintiffs boarded the plane in New York and were headed for Mexico City. The fact that the ticket failed to list the intermediate stops in Washington, D. C. and Dallas, in no way deprived them of "a reasonable opportunity to take self-protective measures," since those stops did not change the "international" character of the flight so far as plaintiffs were concerned. See Article 1. Therefore, "delivery" of the ticket had taken place, and the defendant was entitled to avail itself of the Convention's limits on liability.

9. The parties have agreed that this is a question of law for the court to resolve. A replica of the ticket may be found in the district court's opinion, 253 F.Supp. at 240–242.

rier from limiting its liability under the Convention was that the required statement on the ticket "was printed in such a manner as to virtually be unnoticeable and unreadable * * *." Id., at 857.

■ Judge MacMahon appropriately characterized the "notice" to the passengers in his pithy conclusion as "camouflaged in Lilliputian print in a thicket of 'Conditions of Contract' * * *. Indeed the exculpatory statements on which defendant relies are virtually invisible. They are ineffectively positioned, diminutively sized, and unemphasized by bold face type, contrasting color, or anything else. The simple truth is that they are so artfully camouflaged that their presence is concealed." [10]  253 F.Supp. at 243. Accord, Warren v. Flying Tiger Line, Inc., supra, 352 F.2d at 497. But see Seth v. British Overseas Airways Corp., 329 F.2d 302 (1st Cir.), cert. denied, 379 U.S. 858, 85 S.Ct. 114, 13 L.Ed.2d 61 (1964).

We agree that a jury could not reasonably have found that the tickets and baggage checks gave the passengers the required notice. The District Court properly granted partial summary judgment striking out these affirmative defenses of appellant.

Affirmed.

---

10. Moreover, even if a passenger were able to read the printing on the ticket and baggage check, it is highly questionable whether he would be able to understand the meaning of the language contained thereon. For example, the passenger is referred to the carrier's tariffs in order to determine whether his flight is considered "international carriage"; and the carrier's liability is expressed in terms of "French gold francs (consisting of 65½ milligrams of gold with a fineness of nine hundred thousandths)."

In 1963, the Civil Aeronautics Board took cognizance of the difficulty that the average passenger would have interpreting this langage and issued what is now 14 C.F.R. § 221.175, which provides:

(a) In addition to the aforesaid requirements of this subpart, each air carrier and foreign air carrier which, to any extent, avails itself of the limitation on liability to passengers provided by the Warsaw Convention, shall, at the time of delivery of the ticket, furnish to each passenger whose transportation is governed by the Convention and whose place of departure or place of destination is in the United States, the following statement in writing:

Advice to International Passengers on Limitation of Liability

Passengers embarking upon a journey involving an ultimate destination or a stop in a country other than the country of departure are advised that the provisions of a treaty known as the Warsaw Convention may be applicable to their entire journey including the portion entirely within the countries of departure and destination. The Convention governs and in most cases limits the liability of carriers to passengers for death or personal injury to approximately $8,290 and limits liability for loss or damage to baggage.

Additional protection can usually be obtained by purchasing insurance from a private company. Such insurance is not affected by any limitation of the carrier's liability under the Warsaw Convention. For further information please consult your airline or insurance company representative.

*Provided, however,* That when the carrier elects to agree to a higher limit of liability to passengers than that provided in Article 22(1) of the Warsaw Convention, such statement shall be modified to reflect the higher limit. The statement prescribed herein shall be printed in type at least as large as ten point modern type and in ink contrasting with the stock on (1) each ticket; (2) a piece of paper either placed in the ticket envelope with the ticket or attached to the ticket; or (3) on the ticket envelope.

(b) Each air carrier and foreign air carrier which, to any extent, avails itself of the limitation on liability to passengers provided by the Warsaw Convention, shall also cause to be displayed continuously in a conspicuous public place at each desk, station, and position in the United States which is in charge of a person employed exclusively by it or by it jointly with another person, or by any agent employed by such air carrier or foreign air carrier to sell tickets to passengers whose transportation may be governed by the Warsaw Convention and whose place of departure or destination may be in the United States, a sign which shall have printed thereon the statement prescribed in paragraph (a) of this section. Such statement shall be printed in bold face type at least one fourth of an inch high.

MOORE, Circuit Judge (dissenting):

The majority in their opinion indulge in judicial treaty-making. The language of the treaty (referred to as the Warsaw Convention) is clear. Its provisions are not difficult to comprehend. Its mandates are simply stated. Ascertainment of compliance should, therefore, present no real problem.

Passenger tickets were delivered to plaintiffs and their decedents on various dates between January 20, 1960 and February 20, 1960. The flight on which they travelled pursuant to their tickets did not depart until February 25, 1960. The ticket contained the particulars specified in Article 3(1) of the Convention, albeit the reference to the provisions of the Convention with respect to death or injury was in exceedingly small type.

The majority do not approve of the terms of the treaty and, therefore, by judicial fiat they rewrite it. They think a "one-sided advantage" is being taken of the passenger which must be offset by a judicial requirement that the passenger have notice of the limitation of liability. To support their argument they refer, quite illogically in my opinion, to cases in which the courts have held that there was no real delivery of a ticket to the passenger as contemplated by the treaty. Cases based upon facts tantamount to no effective pre-flight ticket delivery,[1] are scarcely relevant to this case where the passengers had their tickets from 3 to 36 days before departure. Were actual notice to be the requirement, every airline would have to have its agents explain to every passenger the legal effect of the treaty and, in all probability, insist that each passenger be represented by counsel who would certify that he had explained the import of the Convention to his client who, in turn, both understood and agreed to the limitation.

The original limitations in the Convention may well be outmoded by now. Substantial revisions upward have been made but they have been made, as they should be, by treaty and not by the courts. Judicial predilection for their own views as to limitation of liability should not prevail over the limitations fixed by the legislative and executive branches of Government even though this result is obtained by ostensibly adding to the treaty a requirement of actual understanding notice. Furthermore, for the courts to say that a jury could not reasonably have found that the ticket gave the passenger the required notice is, upon a motion for partial summary judgment, to usurp the time-honored function of the jury.

For these reasons, I would reverse.

---

**1.** Mertens v. Flying Tiger Line, Inc., 341 F. 2d 851 (2 Cir. 1965) (Military officer already on board an aircraft about to take off when ticket delivered); Warren v. Flying Tiger Line, Inc., 352 F.2d 494 (9 Cir. 1965) (Soldiers handed boarding tickets at foot of ramp leading to plane about to take off); Eck v. United Arab Airlines, Inc., 360 F.2d 804 (2 Cir. 1966) (Warsaw Convention involved only on question of jurisdiction and venue).