**In re AIR CRASH DISASTER AT WARSAW, POLAND, ON MARCH 14, 1980.**

Nos. CV–80–1290, CV–80–1408, CV–80–1665, CV–80–2977, CV–80–1291, CV–80–1473, CV–80–2511 and CV–81–0741.
MDL No. 441.

United States District Court,
E. D. New York.

Feb. 10, 1982.

Speiser & Krause, P.C. by Frank Granito, New York City, for plaintiff.

Condon & Forsyth by George N. Tompkins, New York City (Desmond T. Barry, Jr., Lawrence Mentz, Katherine B. Posner and Peter A. Axelrod, New York City, on the brief), for defendant.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

### I

### INTRODUCTION

All of the above cases arise out of the crash of an aircraft owned and operated by defendant, Polskie Linie Lotnicze ("LOT"), in Warsaw, Poland, on March 14, 1980, which resulted in the deaths of all persons on board, including a group of young American boxers. On April 14, 1981, plaintiffs in *Angela Y. Robles et al. v. Polskie Linie Lotnicze*, CV–80–2977, filed a motion for partial summary judgment in their favor with regard to defendant's sixth affirmative defense which asserted that its liability is limited, "in accordance with the provisions of the Warsaw Convention, defendant LOT's conditions of carriage and tariffs, and defendant LOT's counterpart to CAB Agreement No. 18900, to an aggregate sum not in excess of $75,000." The plaintiffs asserted four arguments:

(1) that the decedents were not given unequivocal notice by LOT that damage recoveries would be limited since the notice in the LOT ticket stock stated only that "the Warsaw Convention *may* be applicable" (emphasis supplied), in violation of Article 3's requirement that the carrier must deliver to each international passenger a ticket which contains "a statement that the transportation *is* subject to rules relating to liability established by this convention" (emphasis supplied);

(2) that the controlling damage limitation is that set forth in the Warsaw Convention, calculated by reference to the free market value of gold, since the limitation so calculated is greater than the $75,000 liability limitation set forth in the Montreal Agreement and since Article 23 of the Warsaw Convention prohibits agreements providing for limitations of liability lower than those proscribed by Article 22(1);

(3) that damages under the Warsaw Convention may be recovered in actual gold; and

(4) that the Warsaw Convention and the Montreal Agreement are contracts between the airlines and the passengers and plaintiffs are not bound by the liability limitations set forth in them but may sue under applicable state law.

After plaintiffs had filed and served their initial motion, they received from defendant a blank LOT ticket stock which is stipulated to be identical to the one allegedly delivered to plaintiffs' decedent, Yrenio Roman Robles, Jr. a/k/a Junior Robles. On the basis of this new factual information, plaintiffs in the *Robles* case asked for partial summary judgment in their favor with regard to the limitation of liability defense on the following ground: The LOT ticket stock contains the "Advice to International Passengers on Limitation of Liability" ("notice") required by the Warsaw Convention, the Montreal Agreement (also referred to herein as "CAB Agreement No. 18900"), and LOT's conditions of carriage and tariff filed with the CAB pursuant to the Montreal Agreement; however, that notice does not conform with the requirements of those agreements because it is printed in type which is smaller than the "10 point modern type" required under the Montreal Agreement in order for the limitation of liability to be effective. As a result, plaintiffs argue, defendant is not entitled to any limitation of its liability.

On August 3, 1981, asserting only the type size argument, plaintiffs in the seven other above mentioned actions filed a separate motion for partial summary judgment dismissing LOT's affirmative defense based on the limitation of liability provisions of the Montreal Agreement and seeking to impose absolute liability for damages resulting from the deaths of plaintiffs' decedents. The basis for this additional request for relief is plaintiffs' argument that defendant remains bound by its waiver of defenses to liability in the Warsaw Convention even though it fails to qualify for limitation of its liability, as a result of its delivery of a defective notice.

Because it is my conclusion that, as to the plaintiffs who are suing as a result of the death of LOT ticket holders, the type size is dispositive of the motions to strike defendant's affirmative defense of limitation of liability, I do not address the lack of unequivocal notice argument raised in the April 14, 1981 *Robles* motion. I will, however, deal with the other three arguments raised by the plaintiffs in *Robles*, since they appear of significance in other cases arising out of the same air crash and part of this multi-district litigation involving passengers who were not LOT ticket holders.

## II

### DISCUSSION

It is undisputed that the passenger ticket pursuant to which plaintiffs' decedents were traveling provided for "international transportation" within the meaning of Article 1(2) of the Warsaw Convention. Since it is also undisputed that the Peoples' Republic of Poland and the United States are both High Contracting Parties to the Warsaw Convention, the Convention unquestionably applies to these actions and governs the rights of the parties herein.

It is also common ground that the Montreal Agreement, which modified certain terms of the Convention relating to limitation of liability, was entered into in 1966 by foreign air carriers, including defendant LOT. There is also no dispute that the agreement was drafted with the participation of the Department of State, the CAB, and the private International Air Transport Association and served as the basis for the United States' withdrawal of its notices of denunciation of the Warsaw Convention because of the Convention's low liability limitations. *See Reed v. Wiser*, 555 F.2d 1079, 1087 (2d Cir.), *cert. denied*, 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977).

### THE TYPE SIZE ARGUMENT

As evidenced by its terms, the signatories to the Montreal Agreement agreed (1) to file a tariff with the CAB providing for a "special contract" pursuant to Article 22(1) of the Convention between themselves and their passengers in which they would agree

to increase the limit of their liability to $75,000 and to waive their defenses under Article 20(1) of the Convention [1]; and (2) to include within their tickets "a notice in 10 point modern type" [2] advising international passengers of the newly applicable limitation of liability.

There is no question that the Montreal Agreement was intended to inure to the benefit of American passengers and their heirs at law. These persons are, accordingly, if not persons in whose favor a cause of action was created by international agreement, *see Benjamin v. British World Airways*, 572 F.2d 913 (2d Cir. 1978), third-party beneficiaries of the Montreal Agreement entitled to enforce its terms. *See Owens v. Haas*, 601 F.2d 1242, 1250 (2d Cir. 1979); *Port Chester Electrical Construction Corp. v. Atlas*, 40 N.Y.2d 652, 655, 389 N.Y.S.2d 327, 330, 357 N.E.2d 983, 985 (1976); *Lawrence v. Fox*, 20 N.Y. 268 (1959); *Goodman-Marks Associates, Inc. v. Westbury Post Associates*, 70 A.D.2d 145, 420 N.Y.S.2d 26, 28–29 (2d Dep't 1979). *See also, Solmo v. Rosenberg*, 31 Misc.2d 911, 221 N.Y.S.2d 56, 57–58 (Sup.Ct. Nassau Co. 1961).[3]

It is also clear that defendant's use of 8.5 point, rather than the specified 10 point, type constitutes a breach of that contract. Defendant argues, however, (1) that its breach was "purely technical," (2) that the 8.5 point type substantially complies with the purpose of the 10 point type requirement, which, as expressed in *Lisi v. Alitalia-Linee Aeree Italiane, S.p.A.*, 370 F.2d 508 (2d Cir. 1966), *aff'd by an equally divided court*, 390 U.S. 455, 88 S.Ct. 1193, 20 L.Ed.2d 27 (1968), is to give passengers adequate notice of the applicability of the Convention in order to afford them a reasonable opportunity to take self-protective measures, and (3) that the only penalty for failure to comply is a civil penalty of $1,000, pursuant to 42 U.S.C. §§ 1374 and 1471, for failure to comply with LOT's tariffs on file with the CAB.[4]

Article 3 of the Warsaw Convention requires that the passenger ticket contain a "statement that the transportation is subject to the rules relating to liability established by this convention" and that "if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those

---

**1.** Article 20(1) states that "[t]he carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures."

**2.** It is not disputed that the term "10 point modern type" has a technical, readily ascertainable meaning or that it was intended that the term be given that meaning in interpreting the Agreement. 10-point type contains 7.2 lines of type per inch; and, while "modern type" describes a variety of type faces, the United States Government has a definition for that term which is used by the CAB and is presumably intended to be used here. In all events, it is the type size and not the type face which is at issue in this case.

**3.** And see generally, 16 Am.Jur. pp. 55–85 (1978); 17 Am.Jur.2d §§ 302–19 (1964).

**4.** Defendant argues in the *Robles* case that, even assuming the notice provided on its ticket was inadequate, that deficiency was cured since plaintiffs' decedent was issued a ticket stock by American Airlines in San Diego, California, covering his flight to New York, which fully conformed to the requirements of the Montreal Agreement, and thereby received ade-

quate notice of the applicability of liability limitations. This argument is unpersuasive. The language of the Warsaw Convention as well as that of the Montreal Agreement is clear: Each international carrier bears the burden of delivery of notice to its own passengers. Defendant's reliance on the First Department's decision in *Manion v. Pan American Airways, Inc.*, 80 A.D.2d 303, 439 N.Y.S.2d 6 (1st Dep't 1981), is misplaced. The *Manion* court found that Pan Am's delivery of notice to its passenger in Rome during a stop-over in travel between New York and Saudi Arabia before she boarded the plane on which she was injured, was adequate under *Lisi* to limit Pan Am's liability for the injury. Here, defendant seeks to limit its liability despite its own failure to comply with the delivery requirements by relying on notice provided in a ticket provided by a different carrier, relating to a flight which did not leave the boundaries of the United States. There is no reason to think in this case that the delivery of this ticket was adequate to give notice to Robles that he should purchase insurance or decide not to board the LOT flight because of the information contained in the American Airlines ticket. *Cf. Lisi v. Alitalia-Linee Aeree Italiane, S.p.A., supra.*

provisions of this convention which exclude or limit his liability." This language has been interpreted to require that in order for the carrier to limit its liability pursuant to Article 3 the ticket delivered to a passenger must adequately notify him of the applicability of the Warsaw Convention and must be delivered to him "in such a manner as to afford him a reasonable opportunity to take measures to protect himself against the limitation of liability," for example, by purchasing insurance or deciding not to board the plane. *Lisi v. Alitalia-Linee Aeree Italiane, S.p.A., supra,* 370 F.2d at 512; *accord, Mertens v. Flying Tiger Line, Inc.,* 341 F.2d 851, 856 (2d Cir.), *cert. denied,* 382 U.S. 816, 86 S.Ct. 38, 15 L.Ed.2d 64 (1965); *Warren v. Flying Tiger Line, Inc.,* 234 F.Supp. 223 (S.D.Cal.1964), *rev'd,* 352 F.2d 494 (9th Cir. 1965). In *Lisi,* which involved a ticket issued before the effective date of the Montreal Agreement, the Second Circuit stated that, because the "arbitrary limitations on liability" contained in the Convention are advantageous to the carrier, "the *quid pro quo* for this one-sided advantage is delivery to the passenger of a ticket . . . which give[s] him notice that on the air trip he is about to take, the amount of recovery to him or his family in the event of a crash is limited very substantially." 370 F.2d at 512–13. The court held that the "exceedingly small" or "Lilliputian print," at issue in that case (apparently in 4 point type) was inadequate as a matter of law. *Id.* at 513–14. The court also noted that as early as 1963 the CAB had issued a regulation at 14 C.F.R. § 221.175 which provided that the notice of limitation of liability was to be printed in type "at least as large as ten point modern type." 370 F.2d at 514 n.10.

The court in *Lisi,* however, did not specify the size of type that it would consider to be adequate. Moreover, several cases following *Lisi* held that notices printed in 8 point type, *see Millikin Trust Co. v. Iberia Lineas Aereas De Espana, S.A.,* 11 Av.Cas. 17,331 (Sup.Ct. N.Y. Co. 1969), *aff'd,* 36 A.D.2d 582, 317 N.Y.S.2d 734 (1st Dep't 1971), and even 4½ point type, *see Ludecke v. Canadian Pacific Airlines, Ltd.,* 53 D.L. R.3d 636 (Que.C.A.1971), *aff'd on other*

*grounds,* 98 D.L.R.3d 52 (Can.S.Ct.1979), satisfied the requirements of Article 3 of the Warsaw Convention.

These cases do not, however, take into account the language of the Montreal Agreement which deals explicitly with the size of the type required for adequate notice. As noted the Montreal Agreement represents a contract between the signatories by which the air carriers agreed to offer their passengers "special contracts" increasing the limitation on liability set forth in the Warsaw Convention in return for the withdrawal by the United States of its denunciation of the Convention. *See In re Air Crash in Bali, Indonesia,* 462 F.Supp. 1114, 1123–24 (C.D.Cal.1978); *Reed v. Wiser, supra,* 555 F.2d 1087; *Husserl v. Swiss Air Transport Co., Ltd.,* 351 F.Supp. 702, 704 n.1. (S.D.N.Y.1972), *quoting* L. Kreindler, 1 *Aviation Accident Law,* Ct. 12, § 12A.02 at 3 (1975). The United States repudiated the Warsaw Convention out of its desire to safeguard and protect American citizens who travel overseas, and it sought through the Montreal Agreement to raise the Convention's liability limitation and otherwise improve the posture of the passenger *vis á vis* the carriers as a condition for withdrawal of its repudiation. *See* Lowenfeld, *Aviation Law* § 5.31 at 7–129 (2d ed. 1981); Lowenfeld & Mendelsohn, *The United States and the Warsaw Convention,* 80 Harv.L.Rev. 497, 546–52, 586–96 (1967). As part of the agreement, the parties adopted the terms of the CAB regulation § 221.175 and agreed that notice be printed in 10 point modern type. LOT now argues, in effect, that its failure to deliver a ticket which complies with this provision is excused by the doctrine of substantial performance.

Although there is authority for the proposition that the doctrine of substantial performance applies to contracts of transportation, 3A *Corbin on Contracts* § 701 (1960 ed.), it bears noting that the contract with which we are dealing is not the contract of transportation itself, but rather the Montreal Agreement. The importance of the distinction becomes meaningful in the context

of Corbin's analysis of the substantial performance doctrine in terms of the purposes of the particular contract said to have been substantially performed: "Extremely important factors in solving the present problem are the character of the performance that the [party claiming substantial performance] promised to render, the purposes and ends that it was expected to serve in behalf of the [promisee] and the extent to which nonperformance by the [promissor] has defeated those purposes and ends, or would defeat them if the errors and omissions are not corrected." *Id.* at § 706.

Here, the character of the performance promised, notice in a specified type size, itself suggests that strict compliance was intended by the parties to the Montreal Agreement. But it is because of the purposes of that agreement and the degree to which they would be frustrated if the argument were permitted that I conclude that LOT's defense of substantial performance must be rejected.

The purpose of the Montreal Agreement (as distinguished from the purpose of the "special contracts" between carriers and passengers entered into pursuant to it), like the purpose of the Warsaw Convention it preserved, was to regulate by uniform terms the conditions on which the United States would continue to adhere to the Warsaw Convention and on which the air carriers would heretofore deal with their customers. *See Reed v. Wiser, supra,* 555 F.2d at 1090–91. Thus, while the purpose of the contract evidenced by the passenger ticket was to provide international air transportation and to give "adequate" notice of the carrier's limitations on its absolute liability, the purpose of the Montreal Agreement was to secure a uniform standard as to what constituted adequate notice subject to easy administration and rapid determination of the parties' rights. *Id.* Given such a quasi-legislative purpose it may be doubted whether the doctrine of substantial performance has any application at all to a contract such as this one. If the doctrine does apply, it is clear that permitting not one, but eight ticket stocks on a single flight to deviate from the requirements of the Agreement on the grounds of substantial performance would severely undercut, if not entirely frustrate, the uniformity and precision sought to be gained. In the circumstances, LOT's failure to abide by the terms of the Montreal Agreement with regard to type size, to which it has further bound itself through its tariff filed with the CAB, can hardly be called technical or insubstantial. Moreover, since the requirement derives from its contractual obligations in the Montreal Agreement, LOT's argument that the only consequence of the breach is that it should be fined under applicable CAB regulations for failure to comply with the terms of its tariff must be rejected.

■ This reasoning similarly compels rejection of defendant's final argument that, in the event that the limitation of liability provision of the Montreal Agreement is determined to be inapplicable by virtue of the type size of the tickets, the air carrier is entitled to assert its defenses under Article 20(1) of the Warsaw Convention. Defendant contends that the two provisions are inseparable because the carriers' preservation of their Article 20(1) defenses for claims in excess of $75,000 was the *quid pro quo* for their agreement to increase absolute liability to that amount. *See Lowenfeld & Mendelsohn, supra,* 80 Harv.L.Rev. at 587, 599–601. Plaintiffs argue that the effect of defendant's breach of the notice provisions of the Montreal Agreement is not a return to the Article 20(1) defenses, but rather application of the relevant provisions of the underlying Convention which the Agreement modifies, specifically that part of Article 3(2) which precludes assertion of defenses limiting or excluding liability in the absence of delivery of a ticket meeting the requirements of the Convention.

The defendant in essence seeks rescission of the Montreal Agreement as a result of its unilateral breach. However, well settled principles of contract law provide that rescission can be obtained only by the nonbreaching party. *See Lipsky v. Common-*

wealth United Corp., 551 F.2d 887 (2d Cir. 1976); Nolan v. Sam Fox Publishing Co., Inc., 499 F.2d 1394 (2d Cir. 1974). Since the Montreal Agreement was clearly intended to operate within the framework and incorporate all the relevant provisions of the Convention, Lowenfeld & Mendelsohn, supra, 80 Harv.L.Rev. at 597, the defendant's breach of the provisions of the Montreal Agreement with respect to the delivery of a conforming ticket has the same effect as non-delivery of a conforming ticket as set forth in Article 3(2) of the Convention. Accordingly, I conclude that defendant is not entitled to assert its defenses under Article 20(1) of the Convention as to those claimants suing on behalf of decedents to whom the defendant failed to deliver a ticket meeting the type size requirements of the Montreal Agreement.

## THE GOLD STANDARD ARGUMENT

Were it not for this determination, however, defendant's liability would be limited to the $75,000 per passenger amount set forth in the Montreal Agreement, in the absence of some factual or legal argument not presented on these motions, as none of the plaintiffs' remaining arguments on the present motions prove convincing. The first of plaintiffs' arguments involves the method by which the Warsaw Convention damage limitation should be calculated. Article 22(1) of the Warsaw Convention provides that "[i]n the transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of 125,000 francs." The "franc" is specifically defined as follows: "The sum ... shall be deemed to refer to the French franc as consisting of 65½ milligrams of gold at the standard of fineness of nine hundred thousandths. These sums may be converted into any national currency." Article 22(4). Plaintiffs here assert that the basis for the calculation converting this lim-

itation into United States dollars should be the free market price of gold.[5] The defendant argues that, on the contrary, the conversion should be based on either the exchange value of the current French franc or the Special Drawing Right ("SDR") used by members of the International Monetary Fund as a unit of account. A fourth possible basis for the conversion calculation exists in the last official price of gold in the United States which, while it was championed by neither side in this litigation, was the value upon which Judge Knapp settled when he considered this problem in Franklin Mint Corp. v. Trans World Airlines, Inc., 525 F.Supp. 1288 (S.D.N.Y.1981). I conclude that this latter basis is the one on which the conversion should be premised.

Plaintiffs' position that the market value of gold should determine the value of the Warsaw Convention liability limitation is, according to plaintiffs, supported by decisions by courts in Canada, Greece, Argentina, and Sweden and by legal commentators. Plaintiffs also contend that public policy mandates that the limit be tied to the fair market value of gold, first, because previous modifications in the interpretation of the damage limitations demonstrate that the United States never thought the limitations were immutable, but rather, had to respond to inflation which now can only be insured by use of the fair market price; second, because the United States has demonstrated an aversion to low liability limitations and an interest in maximum recovery for injured parties or their survivors, as evidenced, e.g., by its refusal to adhere to the Hague Protocol and its contribution to the Guatemala Protocol; and, third, because the United States has evinced support for the operation of free market forces in the aviation industry, as evidenced by recent steps toward deregulation. For purposes of computing liability under the Convention, plaintiffs assert, it is of no signifi-

---

**5.** Based on the April 1981 $510-per-ounce value of gold, the damage limitation permitted by Article 22 of the Convention would have to be greater than $120,000. With the fair market value of gold now under $400 per ounce, the maximum permissible limitation would still appear to be in excess of $75,000. Since Article 23 prohibits agreements that provide liability limitations lower than those prescribed in Article 22, the Montreal Agreement, with its $75,000 limit, would be too low.

cance that international currencies are no longer tied to gold, since gold does have a readily determinable value in the market place and is easily traded.

In addition to offering support for their position, plaintiffs enumerate several reasons why they believe the other three possibilities put forward are untenable. The last official price of gold—the $42.22 figure set by Congress in the Par Modification Act, Pub.L. No. 93–110, 87 Stat. 352 (1973), and adopted by the Civil Aeronautics Board in a 1974 order that converted the Warsaw Convention "gold francs" into dollars at that price—has been, they argue, explicitly rejected by Congress when it abolished the "official" price in 1976, effective in 1978. Par Modification Act, Pub.L. No. 94–564, 90 Stat. 2660 (1976). Plaintiffs further argue that the language and the history of the Warsaw Convention do not support calculating the Article 22 damage limitation by reference to an "artificial" gold value, since the intention of those who wrote the treaty was that the damage limitations have a uniform value throughout the world and that no one nation have the unilateral power to fix the conversion rate. Finally, plaintiffs note that, although the CAB has stated that it is taking no official position in the gold controversy, a CAB official, in a March 1980 internal memorandum, expressed the view that changes in the applicable laws have removed the legal basis for using the $42.22 conversion figure. (Internal Memorandum of Civil Aeronautics Board written by Patricia Kennedy, p.3, dated March 18, 1980.)

Plaintiffs' opposition to basing the calculation on the current paper franc of France, one of the units suggested by the defendant, is simply that the history and development of the Warsaw Convention gold clause require rejection of any reliance upon paper money. As plaintiffs note, in the inflationary period of the Convention's origin the franc was considered an "imaginary unit of account" (Reply Memorandum of Points and Authorities in Opposition to LOT Arguments to Plaintiffs' Motion for Summary Judgment and Alternatively to Strike the Warsaw Convention-Montreal Agreement Defenses, p.12), significant only in that it was the link to the real monetary unit, gold, which was adopted to achieve a uniform method by which the damage limitation could be calculated by all the contracting parties without being tied to a fluctuating national currency. Adopting the paper-franc standard would, according to plaintiffs, violate fundamental principles of treaty interpretation, since it would require the court to read Article 22(4) out of the Convention and substitute its own method of calculating the damage limitation.

Although the plaintiffs fail to address the final option—the SDR—expressly, it is clear from the arguments that they advance that they do not support basing the calculation of damages upon this unit either. They would undoubtedly argue, as they have done explicitly in reference to the current franc, that courts may not annul or disregard provisions of a treaty upon any notion of equity, general convenience or even substantial justice, which is in fact what the Court would be doing were it to read Article 22(4) out of the Convention and substitute an alternative method, based on the SDR, of calculating the liability limit.

The defendant LOT disputes plaintiffs' contention that the fair market value of gold is the proper basis for the liability limitation calculation and suggests that the Court refer to either the current French franc or the SDR, the international monetary standard that has, according to LOT, replaced gold as an international standard of value.

Defendant's position is based primarily on its views of the changing international monetary system. At the time of the Warsaw Convention, according to defendant, gold formed the basis for the international monetary system and was the means through which currencies were converted. Similarly, in 1955, when the Hague Protocol was adopted, and in 1971, when the Guatemala Protocol was adopted, gold continued to play an important function as a common monetary denominator, a function that was given official status by the International

Monetary Fund, created by the Bretton Woods Conference in 1944. Because of this role, it made sense at the time that all these treaties were drafted, according to defendant, to specify the liability limitation in terms of a unit of account tied to a specified weight of gold with a certain fineness, since it was easy to convert that unit to determine what the liability limitation was in terms of each carrier's domestic currency. Now, however, defendant argues, gold no longer plays any role in the international monetary system, but is instead merely a commodity permitted to fluctuate without official intervention or concern for its role as a common monetary denominator. As of 1978, defendant contends, the Standard Drawing Right has been substituted for gold as the standard unit of account and common denominator for exchange arrangements. Accordingly, either the SDR or the French franc, rather than gold, is appropriately used as the measure of compliance with the Warsaw Convention's requirements.

In terms of the intent of the Convention's drafters, defendant argues that use of the fair market value of gold would contravene one of the primary purposes of the Convention, that of providing a uniform, definite limit of liability for the carriers. *See Reed v. Wiser, supra,* 555 F.2d at 1079. According to the defendant, in place of a precise, internationally controlled figure for airline liability, agreeable to nations with varying standards of living, would be the uncontrolled variations of an international commodities market.[6]

As further support for the rejection of a standard based upon the fair market value of gold, defendant cites the Legal Committee of the International Civil Aviation Or-ganization, which prepared the draft of the Montreal Protocols that was adopted at the International Conference on Air Law in Montreal in 1975. The Legal Committee adopted a resolution, with which the United States delegate to that committee agreed, specifically stating that, because of the change in the character of the market for gold since adoption of the Warsaw Convention, conversion of the Convention's limitation on liability in terms of Poincaré francs into national currencies other than gold "should not be made on the basis of the price of gold on the free market for that metal."[7] (Summary Report of the ICAO Legal Committee, Doc. 9122, L/C 172, 25/10/74.)

Accordingly, defendant argues that it no longer makes sense to base the liability limitations on the value of gold and that a unit that has some current monetary significance—either the French franc or the SDR—should be substituted.

The suggestion that receives the most attention by LOT is the one that utilizes the current French franc as the unit for the purposes of calculating the Convention's liability limitation. The merit of this argument is that it does not depart entirely from the language of the Convention. Moreover, defendant states that "[e]very court considering the question [presented here] since gold became just a commodity traded on the speculative market has found that the francs specified in Article 22 of the Warsaw Convention must be taken to refer to the current French franc." In support of this statement, however, defendant cites only a 1980 district court opinion, *Kinney Shoe Corp. v. Alitalia Airlines,* 15 Av.L.Rep. 18,509 (S.D.N.Y.1980), and a 1980 French case, *Chamie v. Egyptair,* Judgment of Jan-

---

**6.** As an example, defendant refers to the Guatemala Protocol, which was signed by the United States but never ratified. That Protocol revised the limits of the Warsaw Convention to an equivalent value of $100,000, based upon the then "official" price of gold. In April 1981, if the fair market price of gold were used, the limit set forth in the Protocol would be approximately $1,400,000 (based upon a $490 per ounce price of gold), and certainly, defendant asserts, no one intended that.

**7.** Plaintiffs dispute the significance of the Legal Committee's resolution since at the time of the resolution there were two prices of gold in effect, an official one and a fair market one. Now, since there is no longer an official price, plaintiffs contend that reliance on the resolution is misplaced.

uary 31, 1980, Cour d'appel, Paris [1980] D.S.Jur. ———. Judge Haight, in *Kinney Shoe Corp., supra,* made the conversion, but without comment as to why he relied upon the current French franc. In *Chamie, supra,* however, the court stated that:

"the French franc of today, heir of the 1926 Poincaré franc, with a gold weight identical to the Warsaw franc, to the old franc, then to the New franc of 1960, defined by a gold weight after the 1969 devaluation, having lost since April 1978 all reference to a gold value and being accepted as legal tender for international debts, [the present French franc] is the only one to be used for the conversion of Warsaw francs into national currency and must be accepted as having a value identical to the 1926 French franc on the international scene but without a reference to gold."

Defendant also refers in this connection to the legislative history of the Convention to support its conclusion, stating that the insistence by the delegates at the Convention upon the gold standard was an insistence based upon the *monetary* aspect of gold and that now, with gold no longer playing a monetary function, it is only logical to revert to francs themselves to determine the appropriate liability limitation. Against this argument must, however, be weighed the consideration, recognized elsewhere by LOT, that the parties to the Warsaw Convention deliberately sought to avoid the dangers inherent in placing the definition of the limitation of liability within the control of any single country.

Alternatively, defendant suggests that Poincaré francs could be converted into SDRs, which, it asserts, are the modern-day equivalent of gold as the monetary standard internationally, and then into dollars. Defendant argues that there is support for this approach in the United States' proposal to the Legal Committee of the International Civil Aviation Organization for the Montreal Protocols to amend the Warsaw Convention. In that proposal the United States suggested substituting SDRs for French francs; and, because of the widespread use of the SDR as a unit of account, its use was adopted in the Protocols and Article 22 rewritten to reflect the substitution. The Montreal Protocols are still pending adoption, however; and the Warsaw Convention has not been amended to reflect the substitution of SDRs for gold.

■ Considering all of the arguments put forth by the parties, I conclude that neither party has championed the result that seems to me to make the most sense under the circumstances. In short, I conclude that, in determining whether limitation of liability clauses expressed in terms of United States dollars comply with the Warsaw Convention's provisions on the maximum permissible limitation of liability, the calculation is appropriately made in terms of the last official price of gold, $42.22 per ounce.

Defendant is correct in pointing out that, at the time of the various conventions and protocols, gold formed the basis for the international monetary system and that it was because of gold's function that all of the treaties were drafted to specify the liability limitation in terms of a unit of account tied to a weight of gold with a certain fineness. *See, e.g., Asser, Golden Limitations of Liability in International Transport Conventions and the Currency Dispute,* 5 J.Mar.L. & Com. 645, 663 (1974). See also the recorded comments of the Swiss Representative, Mr. Pittard, at the Warsaw Convention, cited in plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Partial Summary Judgment to Strike the Warsaw Convention Defense. The signatories of the treaties looked to gold to avoid fluctuations in the limitations, since gold had a constant value and the currencies of the various nations were subject to unilateral alterations for reasons wholly unrelated to air carriers' liability. This constancy and stability, upon which the parties to the treaties relied, cannot be achieved if the fair market value of gold is used for the calculations. To substitute the fluctuating price of the commodity gold for the relatively fixed and certain price of an international monetary unit does, as defendant suggests, directly contra-

vene the intentions of all those who adopted the treaties. For this reason, such a substitution is clearly inappropriate, and plaintiffs' suggestion that the fair market value of gold be the basis for the conversion must be rejected.[8]

▇ Nevertheless, it would be a mistake to conclude from the fact that gold no longer plays a role in the international monetary system that all references to gold in the Convention may be ignored in calculating the liability limitation and a new measure substituted, whether the current French franc or the SDR.[9] The Warsaw Convention's damage clauses are, in fact, drafted in terms of gold, and they have not as yet been amended to strike that reference. Both the drafting and redrafting of treaties is the business of branches of this government other than the judiciary. Unless and until the damage clauses are redrafted—no matter how logical it may seem to base the calculations upon the French franc, the SDR or any other currency or unit of account—the judiciary does not have the authority to, as plaintiffs correctly state, "read Article 22(4) out of the Convention and *substitute* an *alternative* method of calculating the damage limit." (Emphasis in original.) Courts are not authorized to annul or disregard provisions of a treaty upon their own notions of equity, general convenience or even substantial justice, *King Features Syndicate v. Valley Broadcasting Co.*, 43 F.Supp. 137 (N.D.Tex.), aff'd, 133 F.2d 127 (5th Cir. 1942), since an annulment or disregard would constitute a modification of the treaty, and treaty modifications are solely within the province of the Senate.

There remains to consider the propriety of using the last official United States price of gold to determine whether the $75,000 limitation of liability provisions set forth in the tickets for these flights were lower than permitted by the Warsaw Convention. The clear merit of using this price as the unit for conversion is that the price constitutes a conversion factor established by precisely the kind of mechanism that the Convention's drafters contemplated when the applicable clauses were drafted. The use of the last official United States price for gold means the use of a conversion factor chosen by the United States at the time the price was set to determine the relationship of this country's currency and those of all other nations using a similar standard for conversion. Such a conversion factor, grounded in the policy of this country with respect to the value of its currency *vis à vis* all other currencies based upon the gold standard, has a stability which would be entirely lost if the unit of conversion were subject to the fluctuations of a private commodities market relatively untouched by the regulating influence of any public policy. At the same time, adoption of a conversion factor keyed to a generally employed international unit of value employs a common denominator of such far-reaching significance for the country that its alteration for any but the most pressing reasons of public policy is not to be foreseen.

---

**8.** As far as I am aware, aside from Judge Knapp's decision in *Franklin Mint Corp., supra,* there has been only one other United States court that has considered this question. That court, the United States District Court of Texas, Southern District, concluded that the proper basis for determining the liability limitation is with reference to the free market price of gold. *Boehringer Mannheim Diagnostics, Inc. v. Pan American World Airways, Inc.*, 531 F.Supp. 344 (S.D.Tex.1981). It did so in spite of its findings that the drafters of the Warsaw Convention used gold as the unit of reference because of its stability and that "to the present day, during the time in which the free-market price of gold has risen to more than $400 an ounce, the CAB has allowed the airlines to calculate their limitation of liability under the Warsaw Conven-

tion based on the artificial, non-existent figure of $42.22 an ounce," the CAB being the "government agency most intimately concerned with the transaction at hand" and its interpretation "[coming] as close as anything to constituting a governmental interpretation of the Article 22 limitation." *Franklin Mint Corp., supra.* I must respectfully disagree with the Texas court's conclusion for the reasons set forth herein.

**9.** As noted *supra*, resort to the current French franc would have the additional drawback of ignoring the desire of the treaty drafters to put it beyond the power of any one country to modify the impact of the Convention.

To be sure, tying the operation of a dynamic clause of the Warsaw Convention, meant to deal with a changing global economy without the need for constant amendment, to the public policy of the United States, as expressed in its official price of gold at one moment in time, runs the risk under some circumstances of itself undermining the intention of the Convention's drafters. But there is no reason to think that there have been such changes in the world's monetary system between the time the last United States gold price was fixed and now that application of the last official price of gold would substantially undermine the intention of the treaty drafters.[10] Moreover, the "legislative history" of the Warsaw Convention (which would appear appropriately to include the history of the Montreal Agreement) itself makes clear that the Convention has never been considered to contain mechanisms so perfectly responsive to changes in the world's economy as never to need amendment or revision by the original signatories. The present situation, in which one of the most important of the world's currencies has separated the value of its currency from the international unit of value in use at the time the Warsaw Convention was drafted, may well be one demanding a response from the world's governments. But there is no reason to suppose that the drafters of the Convention contemplated that a response to such a situation should come from the judicial branch of government of one of the signatory powers acting alone.

I find, therefore, that the conversion should continue to be based upon the last official price of gold, $42.22 per ounce and, accordingly, that the $75,000 limitations of the Montreal Agreement are not below the level provided for in the damage limitation provisions of the Warsaw Convention.

■ Plaintiffs' other arguments in favor of partial summary judgment must be rejected as well. Their assertion that damages under the Warsaw Convention may be

recovered in actual gold is based on an unsupported and unsupportable reading of Article 22(4) of the Convention. Plaintiffs contend that the statement that "the sum ... *may* be converted into any national currency" (emphasis added) means that conversion is optional with the person seeking to recover damages and "that a claimant may elect to accept restitution or compensation by taking delivery of gold and convert it himself at such time as he wishes." Defendant correctly points out that plaintiffs' interpretation has no precedential support and in fact runs counter to settled law.

Section 452 of Title 31 of the United States Code, which has its origin at a time well prior to the Warsaw Convention, provides that "United States notes shall be lawful money, and a legal tender in payment of all debts, public and private, within the United States except for duties on imports and interest on the public debt." The constitutionality of this provision was upheld long ago, *Legal Tender Cases*, 12 Wall. 457 (1871). The Supreme Court has also held, in connection with this statute, that gold need not be tendered in the satisfaction of private obligations unless there is an express promise to pay in gold. *See, e.g., Trebilcock v. Wilson*, 12 Wall. 687, 20 L.Ed. 460 (1871); *Bronson v. Rodes*, 7 Wall. 229, 19 L.Ed. 141 (1869). By parity of reasoning, there is no cause to suppose that the drafters of the Warsaw Convention intended to depart from settled United States law in the absence of some express provision requiring payment in gold at the option of the claimant. The use of the word "may" in the language of the Warsaw Convention is hardly to be construed as such an express agreement that damages under the Warsaw Convention at the option of the claimant are to be paid in gold.

■ Contrary to plaintiffs' final argument, the Warsaw Convention specifically controls and exclusively governs any and all claims for damages arising out of the death or injury of a passenger engaged in interna-

---

10. There are many complaints about the inadequacy of the Warsaw Convention damages limitation given developments in tort law, but they can hardly be laid at the doorstep of changes in the monetary system over the last ten years.

tional air transportation, and plaintiffs cannot maintain a separate wrongful death action for damages under California law. The Warsaw Convention, a treaty of the United States and, therefore, the "supreme law of the land, equal in stature and force to the domestic laws of the United States," *Smith v. Canadian Pacific Airways, Ltd.,* 452 F.2d 798, 801 (2d Cir. 1971), provides that "[t]he carrier shall be liable for damages sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger" (Article 17) and that "any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention ... without prejudice to the questions as to who are the persons who have the right to bring suit and what are their respective rights." (Article 24) A number of authorities have agreed that the Convention was intended to act as an exclusive remedy for the recovery of damages for personal injury suffered in an international airplane accident, see, e.g., *Reed v. Wiser, supra,* and that the language of Article 24 was included specifically for the purpose of preventing the institution of independent claims outside the sphere of the Convention. H. Drion, Limitation of Liabilities in International Air Law 71–72 (1954). Article 24, along with the Article 22 limitation of liability of a carrier, would have no meaning if this exclusivity argument were rejected and plaintiffs were permitted to assert independent causes of action under California law. On the contrary, the purpose of the Convention to regulate in a uniform manner the liability conditions of a carrier engaged in international transportation by air would be defeated. *See, e.g., Benjamins v. British European Airways,* 572 F.2d 913 (2d Cir. 1978), *cert. denied,* 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979); *Reed v. Wiser, supra.* The fact that the passengers' rights in this action in some sense arise out of a "special contract" between the air carrier and the deceased passengers entered into pursuant to the Montreal Agreement in no way detracts from this conclusion. The passengers' "special contracts" are of the type specifically con-

templated by the Warsaw Convention as an appropriate means of increasing the liability limitations set forth in the Convention. Nothing in the authorities or common sense suggests that it was intended that, as a consequence of entering into such "special contracts" with their passengers, the airlines would be deprived of all limitations on liability to the passengers' heirs at law. Clearly, the remedy provided for by the Convention, whether expressed in terms of a cause of action arising under the treaty, *see Benjamins v. British European Airways, supra,* or as a cause of action to enforce rights under the special contracts for increased liability permitted by the Convention was, for the reasons set forth in *Reed v. Wiser, supra,* intended to be exclusive. Accordingly, plaintiffs' application to strike the limitations defense on the theory that it has its origin solely in a contract to which they are not parties must be denied.

Since this Court is of the opinion that this decision involves controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal may materially advance the ultimate termination of the litigation within the meaning of 28 U.S.C. § 1292(b), the issues decided herein with regard to defendant's affirmative defense of limitation of liability are hereby certified for interlocutory appeal.

The parties are directed to appear for a pretrial conference on March 19, 1982, at 10:00 a. m., in Courtroom No. 6, United States Courthouse, 225 Cadman Plaza East, Brooklyn, New York.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.