682 F.2d 406
 Efstratios STRATIS, Plaintiff-Appellee,
v.
EASTERN AIR LINES, INC., and United States of America,
Defendants-Appellants.
EASTERN AIR LINES, INC., Third-Party Plaintiff-Appellee,
v.
UNITED STATES of America, Third-Party Defendant-Appellee,
New York City Health and Hospitals Corporation, Third-Party
Defendant-Appellant,
and
The Jamaica Hospital, Inc., Third-Party Defendant-Appellee.
 Nos. 554, 555 and 705, Dockets 81-6149, 81-6167 and 81-6187.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 11, 1982.
Decided June 30, 1982.
 
 Walter E. Rutherford, Haight, Gardner, Poor & Havens, New York City (Alan D. Reitzfeld, New York City, of counsel), for defendant-appellant and third-party plaintiff-appellee Eastern Air Lines, Inc.
 Richard H. Dolan, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. N. Y., Miles M. Tepper, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for defendant-appellant and third-party defendant-appellee United States of America.
 Michael R. Silberstein, Weiss, Neuren & Silberstein, P. C., New York City, for plaintiff-appellee Efstratios Stratis.
 Howard R. Cohen, Bower & Gardner, New York City, of counsel to Allen G. Schwartz, Corp. Counsel, New York City, for third-party defendant-appellant New York City Health and Hospitals Corp.
 Norman Bard, Gordon & Silber, P. C., New York City, for third-party defendant-appellee The Jamaica Hospital, Inc.
 Before OAKES, NEWMAN and WINTER, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This appeal, chock-full of incongruities and perplexities, involves the June 24, 1975, crash of Eastern Air Lines Flight 66 on its approach to John F. Kennedy Airport, a resulting $6.5 million verdict against Eastern and the United States, an apportionment of 60% of the damages against one of the impleaded defendants, a question of the application of the Warsaw Convention and Montreal Agreement, and a series of questions pertaining to the verdict and the judgments entered thereon. We find that the United States District Court for the Eastern District of New York, Henry Bramwell, Judge, erred on the Warsaw Convention question, and that the verdicts are excessive as well as conflicting. We reverse on Eastern's Warsaw defense, and we reverse and remand for a new trial as to damages unless the plaintiff-appellee is agreeable to the remittitur we set forth below. We affirm, however, with respect to the apportionment of damages.
 
 BACKGROUND
 
 2
 Stratis, a Greek seaman, sustained burns and a cervical fracture in the air crash. He was initially treated at Jamaica Hospital, owned and operated by The Jamaica Hospital, Inc. (Jamaica), and was then transferred to Harlem Hospital, owned and operated by the New York City Health and Hospitals Corporation (NYCHHC). On the fourth day of his stay at Harlem Hospital doctors discovered that Stratis was quadriplegic.
 
 
 3
 Stratis sued Eastern and the United States[1] to recover damages for his injuries. Eastern impleaded, and the Government cross-claimed against, Jamaica and NYCHHC, alleging that malpractice by the hospitals aggravated Stratis's neck injury and thereby caused his quadriplegia. All passenger actions arising out of the crash, which only 11 of the 124 persons on board ultimately survived, were consolidated on the issue of the liability of Eastern and the United States. On the eve of trial the United States consented to the entry of a liability judgment against it; Eastern went to trial and a jury found it negligent. This court affirmed, In re Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975, 635 F.2d 67 (2d Cir. 1980).
 
 
 4
 The trial on the issues of Stratis's damages and the defendants' malpractice claims against Jamaica and NYCHHC culminated in a jury verdict awarding Stratis $6.5 million. The jury found that Jamaica was not liable, but that NYCHHC was negligent and was responsible for 60% of the damages. Because actions against the Government under the Federal Tort Claims Act "shall be tried by the court without a jury," 28 U.S.C. § 2402, the court used the jury verdict as an advisory one in its findings against the Government. As had the jury with respect to Eastern, the court concluded that the Government was liable to the extent of $6.5 million.
 
 
 5
 Curiously, the district court let the question of plaintiff's future expenses for attendant care if he remained in the United States go to the jury. Under the plaintiff's evidence this question could have been resolved in his favor to the tune of $2,002,000, projecting $52,000 a year over plaintiff's life expectancy of 38.5 years. In its findings against the Government, however, the district court found not only that the plaintiff had not established that he would be able to come to this country from his native Greece except on temporary visas for trial and the like, but that in accordance with the plaintiff's evidence the total amount needed for his attendant-care costs in Greece to the end of his life would be only $335,230. Thus the jury's verdict against Eastern probably contains $2 million in costs for attendant care within its $6.5 million total while the court's same total judgment against the United States contains only $335,000 for attendant care. This alone would require reversal of the judgment against Eastern; the evidence was insufficient, as the court noted in its findings against the Government, to permit reasonable persons to conclude that Stratis would receive attendant care in this country.
 
 
 6
 For clarity, we will discuss the facts pertaining to the Warsaw Convention question and the facts pertaining to damages separately.
 
 DISCUSSION
 I. Warsaw Convention and Montreal Agreement
 
 7
 Stratis successfully moved below for partial summary judgment striking Eastern's affirmative defense of limitation of liability under the Warsaw Convention[2] and Montreal Agreement.[3] Surprisingly, Stratis, who could not be affected by a limitation of Eastern's liability because he has the United States as a responsible defendant, is the only one of the parties who argues in his appellate brief that the Convention is inapplicable. The United States, which has everything to gain from having Eastern held not entitled to limit its liability, omits to discuss the point in its brief.
 
 
 8
 On June 23, 1975, Stratis was discharged from his Greek ship, the S.S. Paros, at Baton Rouge, Louisiana. Stratis had requested the discharge, apparently because he was suffering from phimosis. His Seamen's Articles, Greek law, and the immigration laws of the United States required that he be repatriated at the expense of the vessel's owner. Indeed, under United States immigration laws Stratis, along with the three other unlucky Greek seamen who were to be repatriated by way of Eastern Flight 66, had to make "definite arrangements" to depart from the United States before they could enter the country from their ship. 8 U.S.C. § 1282(a); 8 C.F.R. § 252.1(c), (d).
 
 
 9
 The vessel owner's agents accordingly arranged for transportation for the seamen on Delta Flight 412 on June 24 from Baton Rouge to New Orleans and on Eastern Flight 66 on the same day from New Orleans to New York. The seamen were then to connect with Olympic Airways Flight 418 from New York to Athens, also leaving on June 24. Stratis received a ticket covering only the domestic Delta and Eastern flights, though a prepaid ticket "advice" for Olympic Airways Flight 418 was evidently prepared in Olympic's New York City office. The information on this ticket advice was communicated by telephone to the American Airlines desk at John F. Kennedy International Airport, whose personnel operate the Olympic Airways station there. At the airport a ticket which lacked both a date of issuance and a validation stamp was issued for Stratis and a seat for him was confirmed. Validation would have been necessary before Stratis boarded but the deposition testimony of the Olympic revenue accounting manager, Spoulides, was that there was no reason that the ticket could not have been validated when issued.
 
 
 10
 Immigration and Naturalization Service Form I-408, dated June 23, 1975, was filed on behalf of Stratis in order to permit his entry into the United States. As required by INS regulations, the document specifically listed the seamen's "arrangements for departure from the U.S." as involving Delta Flight 412, Eastern Flight 66, and Olympic Flight 418, all on June 24, 1975. A telex dated June 25 from the vessel's agents in the United States to the vessel's agents in Greece, which contained news of the crash, also confirmed that the seamen had been scheduled to connect with the Olympic flight upon their arrival in New York.
 
 
 11
 The rub in the case is, of course, that the only ticket actually delivered to Stratis was the ticket covering the domestic flights. The prepaid ticket advice prepared by Olympic indicated that the passenger should contact the "Air Counter" to pick up the ticket, but because of the crash Stratis obviously was unable to do so. Stratis argues that because a passenger ticket for an international flight was never delivered to him, the Warsaw Convention does not apply. Eastern argues, on the other hand, that it is immaterial that the ticket for the international portion of the flight was not delivered, because an international flight was contemplated by the parties; an international ticket was issued, if not validated or delivered; and the ticket that was issued and delivered for the domestic portion of the flight contained the statement about the applicability of the Warsaw Convention that is required by a Civil Aeronautics Board regulation, 14 C.F.R. § 221.175. We are thus presented with a novel question of law concerning the applicability of the Convention.
 
 
 12
 As clarified in Georgakis v. Eastern Air Lines, Inc., 512 F.Supp. 330 (E.D.N.Y.1981) (holding Eastern collaterally estopped from relitigating against another S.S. Paros seaman, Stratis's Flight 66 seatmate, the Warsaw Convention issue decided in Stratis ), judgment vacated by stipulation (filed Sept. 23, 1981), the court struck Eastern's limitation-of-liability defense first, because Stratis possessed a ticket for purely domestic travel at the time of the crash, and second, because Stratis was inadequately notified of the Warsaw/Montreal limitation-of-liability provisions.
 
 
 13
 The Warsaw Convention applies to "all international transportation of persons, baggage, or goods performed by aircraft for hire." Art. 1. Under Article 3(1), the carrier "must deliver a passenger ticket" containing information such as the places and dates of issue, departure, stops, and destination, and a statement that the Convention's limitation of liability is applicable. Article 3(2) then provides as follows:
 
 
 14
 The absence, irregularity, or loss of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall none the less be subject to the rules of this convention. Nevertheless, if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those provisions of this convention which exclude or limit his liability.
 
 
 15
 Eastern argues that Stratis had been delivered "a passenger ticket" for the accident flight containing the required notice of limitation of liability, that the overall contract was one for international transportation within the meaning of Article 1(3),[4] and that the absence of a delivered international ticket is an irregularity not affecting the validity of the contract of transportation, rather than a failure to deliver disentitling Eastern to limit its liability.
 
 
 16
 The relevant case law does not answer the argument. Each of the cases presented is distinguishable. In Bayless v. S. A. Empresa de Viacao Aerea Grandese, 10 Av.L.Rep. (CCH) 17,881 (S.D.N.Y.1968), a ticket was delivered but the court held that delivery was improper because the notice of limitation of liability was printed in an inadequate manner. In Mertens v. Flying Tiger Line, Inc., 341 F.2d 851 (2d Cir.), cert. denied, 382 U.S. 816, 86 S.Ct. 38, 15 L.Ed.2d 64 (1965), the ticket for the accident flight was not delivered before the plane was boarded, and the notice of limitation of liability was printed in an improper manner. Here there is no contention that the ticket for plaintiff's transportation on Eastern Flight 66 was not properly delivered or that the limitation-of-liability notice on that ticket did not comply in all respects with the Montreal Agreement, see note 3 supra, and the Civil Aeronautics Board regulation, 14 C.F.R. § 221.175, with respect to wording and size of type.
 
 
 17
 In Grey v. American Airlines, Inc., 95 F.Supp. 756 (S.D.N.Y.1950), aff'd on the opinion below, 227 F.2d 282 (2d Cir. 1955), cert. denied, 350 U.S. 989, 76 S.Ct. 476, 100 L.Ed. 855 (1956), on which Eastern relies, the plaintiffs, bound for Mexico, boarded a plane in New York. Their tickets did not list the two intermediate stopping points, Washington and Dallas, and in this action arising out of a crash near Dallas the plaintiffs argued that the carrier's failure to comply with Article 3(1)[5] rendered the Convention's limitation inapplicable. The court disagreed, noting that Articles 4(4) and 9 (dealing with baggage checks and air waybills) expressly deny protection to the carrier with respect to baggage and goods unless certain particulars required by the sections corresponding to 3(1) are present. A comparison of these articles with 3(2)[6] indicated accordingly that delivery of a ticket suffices to limit the carrier's liability with respect to passengers even if the ticket does not contain the particulars required by 3(1). 95 F.Supp. at 758. But in Grey the international ticket omitted domestic stopping places; here, the traveler had been delivered only a domestic ticket, not showing the ultimate overseas destination. The question is whether this, like the omission of domestic stopping places in Grey, is simply a technical irregularity or one that goes to the very heart of the Convention's delivery requirement.[7]
 
 
 18
 In discussing Grey, this court in Lisi v. Alitalia-Linee Aeree Italiane, S.p.A., 370 F.2d 508 (2d Cir. 1966), aff'd without opinion by an equally divided Court, 390 U.S. 455, 88 S.Ct. 1193, 20 L.Ed.2d 27 (1968), stated that the failure to list intermediate stops "did not change the 'international' character of the flight so far as plaintiffs were concerned. See Article I. Therefore, 'delivery' of the ticket had taken place ..." 370 F.2d at 513 n.8. In Lisi the court held that delivery of a ticket without adequate notice that the flight was subject to the Convention was not sufficient to entitle the carrier to the limitation of liability. Rejecting a literal reading of Article 3(2)'s requirement of mere delivery of a ticket in favor of a reading viewed "in light of the other Articles and the overall purposes of the Convention," id. at 512, the court stressed that the key factor is whether the passenger had a reasonable opportunity to take precautions against the limitation of liability:
 
 
 19
 (T)he quid pro quo for (the carrier's) one-sided advantage is delivery to the passenger of a ticket and baggage check which give him notice that on the air trip he is about to take, the amount of recovery to him or his family in the event of a crash, is limited very substantially.
 
 
 20
 Id. at 513.
 
 
 21
 Here we must decide whether Stratis had such notice even though he had not received a ticket for the international flight. Eastern's reliance on Manufacturers Hanover Trust Co. v. American Airlines, Inc., 23 A.D.2d 832, 259 N.Y.S.2d 277 (1st Dep't 1965), a one-paragraph per curiam opinion, is misplaced. The plaintiffs in Manufacturers Hanover had international tickets but argued unsuccessfully that their New York-Los Angeles flight was separate rather than part of an international itinerary. Whether passengers can eliminate the international nature of their travel contract by separately purchasing their domestic and international tickets is a different question from whether the Convention applies when an international ticket has not in fact been delivered. Absent delivery of a ticket for the international leg of the journey, the question is not whether Stratis knew his domestic flight could be subject to the Convention as a leg of an international flight under Article 1(3), note 4 supra, but whether he had reason to know his overall flight was international. If not, he lacked a reasonable opportunity to buy insurance or take other precautions against the limitation of liability; if so, the treaty requires his domestic flight to be subject to the limitation.
 
 
 22
 This court has recently stated that the possible unfairness of the Convention is no reason to construe it narrowly. See Reed v. Wiser, 555 F.2d 1079, 1093 & n.19 (2d Cir.), cert. denied, 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977). See also Benjamins v. British European Airways, 572 F.2d 913 (2d Cir. 1978), cert. denied, 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979); Smith v. Canadian Pacific Airways, Ltd., 452 F.2d 798 (2d Cir. 1971). At the same time, several courts have also noted that the Convention should be interpreted "to accord substance to the protections that Article 3 ... intended to provide airline passengers. The carriers are not to be permitted to use the article as a protective shelter to shield themselves from their responsibilities to the public." Deutsche Lufthansa Aktiengesellschaft v. Civil Aeronautics Board, 479 F.2d 912, 917 (D.C.Cir.1973). See also Egan v. Kollsman Instrument Corp., 21 N.Y.2d 160, 170, 287 N.Y.S.2d 14, 20, 234 N.E.2d 199, 203 (noting that people travel more casually today than in the past, making appropriate a requirement of stricter compliance with the Convention).
 
 
 23
 In the end we are confronted with conflicting directives from the treaty. Under Article 3(1) "the carrier must deliver a passenger ticket" (emphasis added) containing, inter alia, the place of destination. Under Article 3(2), however, "(t)he absence ... of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall none the less be subject to the rules of this convention" (emphasis added).[8] And the provision of 3(2) that disentitles the carrier to limit its liability applies only "if the carrier accepts a passenger without a passenger ticket having been delivered," which is not the situation here.
 
 
 24
 If the "absence" of a ticket does not affect the existence of the contract but the carrier "must deliver" a ticket, what did the treaty-writers intend? We do not know, and to answer the question either way is equally arbitrary or reasonable as we see it.[9] Where, as here, a prepaid ticket advice for the international flight has been prepared and a ticket covering that flight has been issued though not validated or delivered to the passenger; a contract for international transportation had been made and the passenger could not cancel the international portion of the journey without running afoul of his commitments to the immigration authorities; and the passenger had been delivered a ticket from the domestic carrier that gave notice[10] of the Warsaw/Montreal liability limitations, we hold that the passenger is assumed to know the flight was international and the Convention does apply. We specifically limit this holding to its facts.[11]
 
 II. Damages
 
 25
 A multitude of errors, among them excessiveness and the fatal error above mentioned in allowing the jury to include in its award against Eastern a sum for future attendant-care expenses based on the cost of such care in the United States, crept into the total award necessitating a retrial unless Stratis accepts a remittitur. To be sure, Stratis is totally and permanently disabled. As a result of the accident he sustained burns over 30 to 36% of his body, a compression fracture of the cervical fifth vertebra that ultimately caused his quadriplegia, infections, abscesses, skin grafts, and pneumothorax. Hospital personnel performed various medical procedures on him, including a laryngoscopy, insertion of a chest tube, bronchoscopy, the extraction of a subclavian catheter that had been lost in his body, the use of Crutchfield tongs on his head in an attempt to alleviate the spinal-cord damage, mechanical respiration, a pyelogram, and a cystogram. At the present time Stratis suffers not only from quadriplegia, burn scars, diaphragmatic breathing, abnormal bladder and bowel, abnormal sex life, spasticity and ankylosis, hypothermia, headaches, and other injuries, but also has the inevitable emotional difficulties caused by being handicapped and totally dependent on others.
 
 
 26
 On the positive side, Stratis is sufficiently emotionally recovered that he envisions keeping busy by buying and running a small business or store; although he cannot control his lower extremities or torso below his waist, he can position both arms and bring them to his mouth; he sees friends and even has a relationship with a female friend; he remains intellectually active and assists in his grooming and nourishment; he is able to have sexual relations; and he does not suffer physical pain. He has very little or no recollection of the horrible things he went through at Jamaica Hospital in the nine hours immediately following the accident, nor does he recall the first four days of his forty-two day stay at Harlem Hospital. His recollection begins after the point at which he had largely lost the ability to feel physical pain; in that part of his body still capable of feeling pain, his head, the insertion of the Crutchfield tongs involved discomfort but "no serious pain."
 
 
 27
 The jury verdict of $6.5 million against Eastern, of which NYCHHC was found responsible for 60%, was not broken down into components. The district court, on the other hand, did break down its findings into components, and while we need not explore them in microscopic detail, it is plain that several are mistaken. Everyone agrees, and the district court found, that the past medical and related expenses total $85,341.32. The district court properly found the future attendant-care expenses to be $335,230, because Stratis could not show in any manner, shape, or form that he would be able to stay in the United States indefinitely.[12]
 
 
 28
 We do not find excessive the district court's award of $11,000 for the exquisite pain and suffering Stratis endured in the eight to nine hours at Jamaica Hospital. Stratis was suffering from extensive first-, second-, and third-degree burns; had episodes of disorientation, apnea, and bradycardia; underwent a laryngoscopy; and was administered numerous pain-killing drugs. Although Stratis does not remember his stay at Jamaica, the fact that he was administered the drugs, coupled with the evidence that he was not then quadriplegic, is in and of itself indicative that such an award is not excessive.
 
 
 29
 For Stratis's forty-two day stay at Harlem Hospital, where he was in the burn unit and where, according to the jury, he became quadriplegic because of the hospital's malpractice (its manipulation and failure to discover his cervical fracture), the court awarded.$1.2 million for pain and suffering. This amounts to approximately $29,000 a day, which in anyone's calculations has to be excessive, especially considering that because of his quadriplegia Stratis was unable to feel pain after the first four days. See West v. Jutras, 456 F.2d 1222, 1225 (2d Cir. 1972) (a remand for a new trial, or affirmance conditioned on remittitur, is required when an award "is so high that it would be a denial of justice to permit it to stand") (quoting Dagnello v. Long Island Railroad Co., 289 F.2d 797, 806 (2d Cir. 1961)).
 
 
 30
 On the other hand, the judge's award of $250,000 for pain and suffering in the period from August 6, 1975, until January 30, 1976, when Stratis was cared for in the Helen Hayes Hospital, was not out of line. Stratis learned at Helen Hayes that his paralysis was permanent, and went through the emotional trauma associated with that discovery as well as the rehabilitative and other procedures aimed at enabling him to cope with his condition.
 
 
 31
 For the pretrial period and the future, again using a 38.5-year life expectancy, the district court awarded Stratis $60,000 a year for conscious pain and suffering and emotional trauma because of his lack of freedom of movement, his lack of a normal sex life, his dependence on others for attendant care, and the abnormality of his bladder and bowel functions. The district court also awarded.$1.2 million for the "permanent injury" of quadriplegia, a sum presumably intended to compensate for Stratis's physical disability as opposed to the emotional consequences of his condition. We do not know how the judge arrived at these extraordinary figures. In any event, we consider the aggregate award of $3,510,000 for future pain and suffering plus disability to be excessive by at least one-half.
 
 
 32
 Turning to Stratis's lost earnings, the testimony about past and future losses, presented through a Greek lawyer rather than a person expert in the marine industry, is insufficient to support the award. At the time of the crash Stratis was a twenty-year-old Greek seaman earning approximately $4,000 per year. The assumption of the Greek lawyer, Mr. Sfyroeras, was that Stratis would work 150 hours of overtime monthly, but Stratis's wage statements showed previous monthly overtime running from a minimum of 30 hours to a maximum of 132 hours, averaging only 59 hours per month. With that alone the loss of past earnings would have to be reduced from $56,690 to $48,781, and his loss of future earnings from $592,451 to $478,580. Moreover, the court overlooked the evidence that all Greek males must serve two years in the military when they reach the age of twenty-five, which alone requires a further reduction of $16,260 in the award for past lost earnings.
 
 
 33
 In light of these errors in the calculation of damages, we would grant a conditional remittitur to $2,850,000, absent the acceptance of which a new trial on damages is hereby ordered.[13]III. Apportionment of Damages
 
 
 34
 NYCHHC, which the jury found responsible for 60% of the damages, challenges the apportionment by arguing forcefully that Stratis was unsalvageably rendered a quadriplegic at the time of the crash on June 24, 1975. The short answer is, however, that while doubtless the cervical fracture occurred in the crash, there was ample expert and other evidence from which the jury could find that Stratis's quadriplegia was preventable, and that he was not rendered quadriplegic until he became a patient at Harlem Hospital and was subjected to its treatment. This evidence included the testimony of Eastern's expert in neurology and psychiatry, Dr. Kaplan, its internist, Dr. Vorhaus, and its radiologist, Dr. Carothers; the Government's trauma surgeon, Dr. Swan; and the hospital records at Jamaica and Harlem hospitals showing Stratis's ability to move his four limbs even after he was in the latter.
 
 
 35
 The records show an early orthopedic examination at Harlem Hospital indicating "full Range of Motion" of upper extremities and "(n)o gross loss of motor Power," as well as an entry by the surgical resident in charge almost twelve hours later that "(p)atient can move all limbs" and the next day a note by a neurologist that "Pt moves all extremities." The neurologist who saw Stratis as a quadriplegic three days later wrote:
 
 
 36
 COMMENT: Fx (fracture) obviously was present since admission. He apparently was intact at that time (at least 2 nurses remember him thrashing about (with) all 4's). Due to manipulation, intubation, turning, etc., he gradually and progressively (perhaps in intermittent fluctuating manner) sustained spinal cord injury.
 
 
 37
 It is unnecessary to recount the other evidence from which the jury may have inferred that Harlem Hospital was attempting to cover its tracks-a parenthetical note scribbled into the record with a pen using a different color ink ("I never saw any extremities move"); the loss of the X-rays taken immediately after the quadriplegia was discovered. Suffice it to say that even without such an inference the jury's apportionment of damages seems justified.[14]
 
 
 38
 The verdict in favor of Jamaica, which we find to be free from error, was also supported by ample evidence. The 284-bed community hospital was overloaded by the sudden arrival in the hospital of fourteen air-crash survivors, some "burned literally to a crisp" and "partially dismembered." An attending physician testified that Stratis himself was "dying from shock," "leaking like a peeled orange," and "beyond critical," so that first priorities involved saving his life rather than taking cervical and other X-rays, especially in view of his multiple contusions, extensive burns, and the question of inhalation injury. Stratis, it will be recalled, was in Jamaica Hospital for only eight or nine hours and the situation there, as the hospital's Dr. Block testified, was one of triage. It was thus reasonable for the jury to find that Jamaica's failure to X-ray and immobilize Stratis was not negligent.
 
 
 39
 Judgment denying Eastern's Warsaw/Montreal defense reversed. Judgment apportioning damages affirmed. Judgment against defendants on damages reversed and a new trial on damages ordered, unless plaintiff accepts a remittitur to $2,850,000.
 
 NEWMAN, Circuit Judge, dissenting in part:
 
 40
 The Warsaw Convention[1] permits an airline to limit its liability for death or injuries suffered by an international passenger; for airlines flying to and from the United States the limit, modified by the Montreal Agreement,[2] is $75,000. Before an airline receives the benefit of such a generous treaty, it should be clear that the terms of the treaty have been met. In this case, I respectfully dissent from that portion of the majority opinion holding Eastern Airlines entitled to use the Convention in defense of the claim of Efstratios Stratis because, in my view, the terms of the Convention have not been met.
 
 
 41
 Article 3 of the Convention, which we all agree is an essential requirement for a carrier's limitation of liability, specifies that the carrier must "deliver" a passenger ticket, which, according to Article 3(1), must contain certain information including the place of destination and a statement informing the passenger of the limitation of liability. It is undisputed in this case that the ticket for Stratis's foreign destination was never delivered to him or to anyone acting on his behalf. While Eastern's flight from New Orleans to New York City was crashing on its approach to John F. Kennedy Airport, Stratis's ticket from New York City to Athens awaited him at the ticket counter of Olympic Airways at JFK. Despite this clear-cut noncompliance with the Convention, the majority concludes that it nevertheless applies to limit Eastern's liability for Stratis's injuries. The majority appears to reason that the purpose of Article 3(1)'s delivery requirement is to afford the passenger notice of the limitation of liability so that he can, if he chooses, secure insurance, and that in this case the delivery to Stratis of Eastern's domestic ticket for the flight from New Orleans to New York City furnished adequate notice since it contained the same explanation of the Convention that Stratis would have received from the New York City-Athens ticket, if that ticket had been delivered to him. Additionally, the majority finds an apparent contradiction between Article 3(1)'s delivery requirement and Article 3(2), which provides that the limitation of liability shall apply notwithstanding the "absence, irregularity, or loss" of the ticket. The majority seems to draw from this apparent contradiction a relaxation of the delivery requirement. In my view, the command of Article 3(1) is clear, it is not satisfied by delivery of a ticket for a domestic flight, and Article 3(2) can and should be read in a manner that avoids any contradiction with the terms of Article 3(1).
 
 
 42
 As the majority recognizes, a purpose of the ticket delivery requirement of Article 3 is to provide the passenger with notice of the limitation of liability, one of the items that this article requires the ticket to contain. When the article also requires the ticket to contain the place of "destination," it seems clear enough that the ticket required to be delivered is the ticket that completes the international travel, since "international transportation" is defined by the Convention to mean "transportation in which, according to the contract made by the parties, the place of departure and the place of destination ... are situated ... within the territories of (two signatory nations)."[3] In this case, "destination" as used in Article 3 must mean Athens; if Stratis's destination was not in a country other than the United States, the Convention would not even arguably apply to his flight from New Orleans to New York City. I do not doubt that when the ticket delivery requirement of the Convention has been met, the Convention applies to the domestic leg of an international journey. But I find nothing in the Convention that excuses non-delivery of the ticket for travel to the foreign destination simply because the ticket for the domestic segment of a trip contains notice of the liability limitation applicable to foreign travel.
 
 
 43
 There is good reason for the Convention drafters to have insisted that notice of the limitation of liability be provided by the ticket for travel to the foreign destination. The notice appearing in both the undelivered Olympic ticket and the delivered Eastern ticket appears under the caption, "Advice to International Passengers on Limitation of Liability." A traveler on the domestic leg of an ultimately foreign journey might well fail to read the notice, thinking that, while on the domestic leg, he is not an "international passenger" to whom the notice is directed. However, this same caption appearing in his ticket to his foreign destination is more likely to attract his attention since he should reasonably expect a notice captioned "Advice to International Passengers" to apply to a holder of a ticket to a foreign destination. Once alerted to the notice by a caption appearing in his foreign travel ticket, he then learns from the text of the notice that "on a journey involving an ultimate destination or a stop in a country other than the country of origin" a Convention limiting liability is applicable to "the entire journey, including any portion entirely within the country of origin...."[4]
 
 
 44
 Another reason why Article 3 should be interpreted to require delivery of the ticket for the passenger's foreign destination is the increased opportunity for a passenger to gain notice of important items like limited liability in a language he understands. Judicial notice may be taken of the fact that while English is the international language of air travel, tickets issued by most carriers, including Olympic, print Warsaw Convention and other information in both English and the language of the carrier's country. A Greek passenger flying from New York City to Athens on Olympic Airways will be informed of the limitation of liability in Greek.[5] Of course, many travelers are subject to the Warsaw Convention when they fly from one country to another on a carrier based in a country whose language they do not understand, but delivery of the ticket for travel to the foreign destination will increase comprehension for many travelers,[6] and would have been more informative for Stratis. In any event, delivery of that ticket is what the Convention requires. For the Convention to apply to Stratis, there must be delivery of his ticket for transportation to his "destination," Article 3(1)(b), which was Athens, whether that transportation is provided "under the form of a single contract or of a series of contracts," Article 1(3).
 
 
 45
 The majority asks, "If the 'absence' of a ticket does not affect the existence of the contract (per Article 3(2) ) but the carrier 'must deliver' a ticket (per Article 3(1) ), what did the treaty-writers intend?", supra, at 412-414. I think the answer is obvious. They intended, just as they said, that a ticket must be delivered to the passenger; thereafter, the absence, even the loss, of that ticket when the passenger arrives to board the plane does not impair the contract of transportation or remove the limitation of liability. The second sentence of Article 3(2) supports this interpretation. By removing the limitation of liability for a carrier who accepts a passenger to whom a ticket has not been delivered, the Article plainly implies that the "absence" of a ticket mentioned in the first sentence pertains to a passenger to whom a ticket has previously been delivered. With delivery, there is limited liability even if the ticket is later absent; without delivery, there is no limitation of liability. At a minimum, this reading of both subsections of Article 3 follows the traditional approach of according, whenever possible, a consistent reading to all the language of a document.
 
 
 46
 I fully agree with the majority that, under our prior decisions, the possible unfairness of the Convention is no reason to construe it narrowly. But surely its unfairness is not a reason to construe it broadly. If there ever was a case where an entity seeking a windfall[7] from the terms of a provision should be held to a literal application of those terms, it is a common carrier seeking refuge in a limitation of liability. See Zacharia v. Harbor Island Spa, Inc., --- F.2d ---- No. 81-7558 (2d Cir. June 25, 1982) (hotel not entitled to statutory limitation of liability for loss of guest's property where terms of liability not strictly observed, even though hotel furnished guest with notice of the limitation).
 
 
 47
 I dissent from the ruling affording Eastern Airlines the protection of the Warsaw Convention. I concur in all other portions of Judge Oakes' opinion for the Court.
 
 
 
 [1]
 The United States employed the allegedly negligent air traffic controllers
 
 
 [2]
 Convention for the Unification of Certain Rules Relating to International Transportation by Air, concluded at Warsaw, Poland, October 12, 1929, adhered to by the United States June 27, 1934, 49 Stat. 3000, 3014, reprinted in 49 U.S.C. following § 1502. Article 22 contains the limitation-of-liability provisions
 
 
 [3]
 Agreement Relating to Liability Limitations of the Warsaw Convention and the Hague Protocol, Agreement CAB 18900, approved by CAB Order No. E-28680, May 13, 1966, 31 Fed.Reg. 7302 (1966). In the Montreal Agreement the signatory airlines, including Eastern, agreed to enlarge their maximum liability to $75,000 per passenger and to make liability for injuries described by Article 17 of the Convention absolute, Day v. Trans World Airlines, Inc., 528 F.2d 31, 33 (2d Cir. 1975), cert. denied, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976)
 Article 1
 (3) Transportation to be performed by several successive air carriers shall be deemed, for the purposes of this convention, to be one undivided transportation, if it has been regarded by the parties as a single operation, whether it has been agreed upon under the form of a single contract or of a series of contracts, and it shall not lose its international character merely because one contract or a series of contracts is to be performed entirely within a territory subject to the sovereignty, suzerainty, mandate, or authority of the same High Contracting Party.
 We agree with Eastern that the undisputed facts, especially INS Form-I408, to which the court below never referred, establish that Stratis had a "contract" within Article 1(3) for international travel. Acceptance of prepayment by Olympic constituted the formation of such a contract, irrespective of delivery of the ticket.
 Article 3
 (1) For the transportation of passengers the carrier must deliver a passenger ticket which shall contain the following particulars:
 (a) The place and date of issue;
 (b) The place of departure and of destination;
 (c) The agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity, and that if he exercises that right, the alteration shall not have the effect of depriving the transportation of its international character;
 (d) The name and address of the carrier or carriers;
 (e) A statement that the transportation is subject to the rules relating to liability established by this convention.
 Article 3
 (2) The absence, irregularity, or loss of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall none the less be subject to the rules of this convention. Nevertheless, if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those provisions of this convention which exclude or limit his liability.
 
 
 [7]
 Arguably, the reasoning of the decision in Grey, though not necessarily the result, was completely wrong. Why would the treaty-writers give less protection to passengers than to baggage or goods? Were not the particular provisions of Articles 4(4) and 9 merely a narrowing of the carrier's liability rather than an indication that the treaty-writers intended to treat passenger tickets as mere formalities except when they omit reference to the limitation provisions?
 
 
 [8]
 It cannot be argued that "the contract" here related only to the flights with domestic destinations, for "a series of contracts" involving "several successive air carriers" is subject to the Convention even if one contract or a series of them is to be performed entirely domestically. Article 1(3), note 4 supra. Of course, how far this goes in time is another matter. Would a shuttle trip from Boston to New York with a contemplated week's stay in New York, to be followed by an international flight, be subject to the Convention? We are not concerned with that question here because immediate embarkation on the last leg of the trip to Athens clearly was in the parties' contemplation
 
 
 [9]
 No comments in the legislative history of the treaty, see, e.g., I1 Conference Internationale de Droit Prive Aerien, 4-12 Octobre 1929, Varsovie (Warszawa 1930), indicate how the framers would answer this question
 
 
 [10]
 The Eastern ticket contained two notices, the first of which is in accordance with CAB regulations, 14 C.F.R. § 221.175(a), and the second of which is gratuitous, the first reading in part as follows:
 ADVICE TO INTERNATIONAL PASSENGERS ON LIMITATION OF LIABILITY
 Passengers on a journey involving an ultimate destination or a stop in a country other than the country of origin are advised that the provisions of a treaty known as the Warsaw Convention may be applicable to the entire journey, including any portion entirely within the country of origin or destination. For such passengers on a journey to, from, or with an agreed stopping pace in the United States of America, the Convention and special contracts of carriage embodied in applicable tariffs provide that the liability of certain carriers, parties to such special contracts, for death of or personal injury to passengers is limited in most cases to proven damages not to exceed U.S. $75,000 per passenger, and that this liability up to such limit shall not depend on negligence on the part of the carrier. The limit of liability of U.S. $75,000 above is inclusive of legal fees and costs except that in case of a claim brought in a state where provision is made for separate award of legal fees and costs, the limit shall be the sum of U.S. $58,000 exclusive of legal fees and costs. For such passengers traveling by a carrier not a party to such special contracts or on a journey not to, from, or having an agreed stopping place in the United States of America, liability of the carrier for death or personal injury to passengers is limited in most cases to approximately U.S. $10,000 or U.S. $20,000.
 The names of carriers, parties to such special contracts, are available at all ticket offices of such carriers and may be examined on request. Additional protection can usually be obtained by purchasing insurance from a private company. Such insurance is not affected by any limitation of the carrier's liability under the Warsaw Convention or such special contracts of carriage. For further information please consult your airline or insurance company representative.
 ....
 The second reads in part as follows:
 NOTICE
 If the passenger's journey involves an ultimate destination or stop in a country other than the country of departure the Warsaw Convention may be applicable and the Convention governs and in most cases limits the liability of carriers for death or personal injury and in respect of loss of or damage to baggage. See also notice headed "Advice to International Passengers on Limitation of Liability."
 CONDITIONS OF CONTRACT
 
 
 [1]
 As used in this contract "ticket" means this passenger ticket and baggage check, of which these conditions and the notices form part, "carriage" is equivalent to "transportation", "carrier" means all air carriers that carry or undertake to carry the passenger or his baggage hereunder or perform any other service incidental to such air carriage, "WARSAW CONVENTION" means the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw, 12th October 1929, or that Convention as amended at The Hague, 28th September 1955, whichever may be applicable
 
 
 [2]
 Carriage hereunder is subject to the rules and limitations relating to liability established by the Warsaw Convention unless such carriage is not "international carriage" as defined by that Convention
 
 
 [3]
 To the extent not in conflict with the foregoing carriage and other services performed by each carrier are subject to: (I) provisions contained in this ticket, (II) applicable tariffs, (III) carrier's conditions of carriage and related regulations which are made part hereof (and are available on application at the offices of carrier), except in transportation between a place in the United States or Canada and any place outside thereof to which tariffs in force in those countries apply
 
 
 [4]
 Carrier's name may be abbreviated in the ticket, the full name and its abbreviation being set forth in carrier's tariffs, conditions of carriage, regulations or timetables; carrier's address shall be the airport of departure shown opposite the first abbreviation of carrier's name in the ticket; the agreed stopping places are those places set forth in this ticket or as shown in carrier's timetables as scheduled stopping places on the passenger's route; carriage to be performed hereunder by several successive carriers is regarded as a single operation
 
 
 [5]
 An air carrier issuing a ticket for carriage over the lines of another air carrier does so only as its agent
 ....
 We may also assume that the carrier complied with paragraph (b) of 14 C.F.R. § 221.175 requiring a notice similar to the first above mentioned to be "displayed continuously in a conspicuous public place" at the ticket counter.
 
 
 [11]
 Curiously, while the Olympic ticket advice covered all four Greek seamen from the Paros and the tickets issued were numbered serially, Stratis's being second in sequence, it was a different person (by number and by handwriting) who completed Stratis's ticket from the one who did the other three. Rather than assume that some fraud was involved, however, we assume that the agent who completed the other three simply was busy or interrupted and asked another agent to fill out Stratis's. But we admit that it is an oddity
 
 
 [12]
 The district court also awarded $141,290 for auxiliary medical expenses Stratis would incur in the amount of $3,669.91 per year over his 38.5-year life expectancy. The $3,669.91 figure represents the annual cost of such services (e.g., annual checkup, wheelchair, hospital beds) in the United States. We find this award troublesome for two reasons. First, it is unclear that Stratis would obtain these services in the United States rather than Greece, where they presumably are far less costly. Second, the testimony was unclear concerning whether the $335,230 figure for expenses in Greece covered only attendant care or auxiliary services as well. Although we do not now find that this award constitutes error, in the event of a new trial the district court should clarify its findings in this regard
 
 
 [13]
 In the event of a retrial the district court would be well advised to apply, in accordance with Doca v. Marina Mercante Nicaraguense, S.A., 634 F.2d 30 (2d Cir. 1980), cert. denied, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981), a discount rate of at least 2% to appellee's future losses. We note also, although the problem is highly unlikely to arise since Eastern admits liability in an amount greater than the Warsaw Convention's maximum and retrial of the Government would not be to a jury, that in case of a jury trial it would be appropriate to charge the jury that it should not increase the damage award to offset any imagined tax impact. Compare Norfolk & Western Ry. v. Liepelt, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), and Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 486-87, 101 S.Ct. 2870, 2879-80, 69 L.Ed.2d 784 (1981) (recommending instruction in cases involving federal-law claims), with Vasina v. Grumman Corp., 644 F.2d 112, 118 (2d Cir. 1981) (not necessary to give instruction in diversity case)
 
 
 [14]
 We find NYCHHC's other contentions to be without merit. Its challenge to the court's inclusion in its charge of provisions of New York State's Hospital Code and New York City's Administrative Code ignores the fact that the provisions were to be considered as evidence only of negligence, which NYCHHC virtually conceded while arguing that it had not caused Stratis's quadriplegia. The charge was proper, was directed mainly at Jamaica Hospital's actions, and caused NYCHHC no harm. We have also reviewed the court's charge on proximate cause and found it to be a correct and clear statement of the law
 
 
 [1]
 Convention for the Unification of Certain Rules Relating to International Transportation by Air, 49 Stat. 3000, 49 U.S.C. following § 1502 (1976)
 
 
 [2]
 Agreement Relating to Liability Limitations of the Warsaw Convention and the Hague Protocol, Agreement CAB 18900, approved by CAB Order No. E-28680, 31 Fed.Reg. 7302 (1966), 49 U.S.C. following § 1502 (1976)
 
 
 [3]
 The definition also includes transportation in which the place of departure and the place of destination are in the same signatory nation "if there is an agreed stopping place within a territory subject to the ... authority of another power, even though that power is not a signatory to this convention." Article 1(2)
 
 
 [4]
 The passenger may not understand that "portion" means a distinct leg of the journey on a carrier different from the overseas carrier and not just the part of the flight to a foreign destination that occurs above the land area of the country of origin, but at least the notice, captioned so as to catch his attention, may reasonably be relied upon to prompt further inquiry
 
 
 [5]
 Presumably, this Court's prior rejection of the adequacy of a "virtually invisible" notice of limitation of liability was premised on the idea that the passenger should have an opportunity to read the notice. Lisi v. Alitalia-Linee Aeree Italiane, S.p.A., 370 F.2d 508, 514 (2d Cir. 1966), aff'd without opinion by an equally divided court, 390 U.S. 455, 88 S.Ct. 1193, 20 L.Ed.2d 27 (1968). The record does not disclose a translation of "limitation of liability," but we may be confident that one is available. See Akins, The Greeks Had a Word For It (1930)
 
 
 [6]
 Toward that end, many carriers, including Olympic, print ticket notices in other languages in addition to English and the language of the country in which the carrier is based
 
 
 [7]
 For Eastern Airlines transporting Stratis from New Orleans to New York City, application of the Convention is unquestionably a windfall. Unlike carriers transporting passengers from one country to another, which at least have the opportunity to adjust their level of liability insurance in light of the Convention's limitation of liability, Eastern had no idea that Stratis was on the domestic leg of an international journey and thus had no occasion to adjust its liability insurance in light of such a circumstance. Eastern would have had such knowledge if it had issued and delivered to Stratis a series of tickets for the entire journey, including the final leg to Athens. In that event, Eastern's entitlement to the Convention's protection would have been indisputable, even though the limitation of liability would probably have remained a windfall