748 F.2d 94
 53 USLW 2281
 In re AIR CRASH DISASTER AT WARSAW, POLAND, ON MARCH 14, 1980.
Jose PIMENTEL, Juana P. Pimentel, Loretta Callahan, Valerie
Miriam, Plaintiffs,
Emily Bland, Patrice Ann Chavis, Henryka Smiegel, Rev.
Raymond B. Wesson, John Lindsay, Venora Lindsay, Patricia
Clayton, Joyce Fulton, Rozena Stewart, Willie Harris, Susan
Janice Radison, Maria Palomino, Pablo Palomino, Ned Good,
and Angela Robles, Appellees,
v.
POLSKIE LINIE LOTNICZE (LOT POLISH AIRLINES), a corporation,
Appellant.
 No. 119, Docket 84-7356.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 17, 1984.
Decided Nov. 13, 1984.
 
 George N. Tompkins, Jr., New York City (Lawrence Mentz, Desmond T. Barry, Jr., Robert J. Brown, Condon & Forsyth, New York City, of counsel), for appellant.
 Frank H. Granito, Jr., New York City (Mark A. Pullano, Catherine V. Granito, Speiser & Krause, P.C., New York City, of counsel), for appellees Bland, Chavis, Smiegel, Wesson, Lindsay, Clayton, Fulton, Stewart, Harris, Radison, and Palomino.
 Steven R. Pounian, New York City (Marc S. Moller, Kreindler & Kreindler, New York City, on brief), for appellee Robles.
 Before OAKES, KEARSE and PRATT, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This interlocutory appeal (28 U.S.C. Sec. 1292(b) (1982)) poses the question unanswered in In re Air Crash Disaster at Warsaw, Poland, on March 14, 1980, 705 F.2d 85 (2d Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 147, 78 L.Ed.2d 138 (1983) (LOT I ). There we held that the international air carrier's use of 8.5- rather than 10-point type to inform passengers of Warsaw Convention[1] limitations of liability violated the Montreal Agreement[2] and thereby stripped LOT Polish Airlines (Polskie Linie Lotnicze) of the protection of those limitations. The unanswered question pertains to passengers who before boarding LOT flew to New York with domestic tickets that apparently gave adequate notice of the Warsaw Convention limitations. Id. at 86 n. 2. The airline here argues that our decision in Stratis v. Eastern Air Lines, Inc., 682 F.2d 406 (2d Cir.1982) (carrier on domestic leg of international flight held entitled to Warsaw Convention limitations protection because passenger had received notice and had reason to know his flight was international), controls so as to protect it with respect to passengers who received warnings about Warsaw Convention liability limitations before they embarked on the domestic leg of the international flight to Warsaw. The United States District Court for the Eastern District of New York, Charles T. Sifton, Judge, found Stratis inapplicable on its facts, adhered to its grant of partial summary judgment to certain plaintiffs, and granted summary judgment to others.[3] We affirm, agreeing that Stratis is distinguishable and also holding that an airline cannot invoke the Convention's limitation on liability if the airline's own tickets fail to give adequate warning of that limitation.
 
 
 2
 All but one of the consolidated death actions involved in this appeal concern passengers traveling under the auspices of the United States Amateur Athletic Union (AAU) for a tournament with the Polish National Boxing Team prior to the intended 1980 Olympic Games. One passenger, Delores Wesson, was the wife of the team physician, traveling in her individual capacity. Each of the boxers, trainers, officials, or members of the AAU contingent was free to go or not to go to Poland or to make his own travel arrangements, though in fact the AAU's travel agent, Crown Travel Coordinators, Inc., arranged for both the foreign and domestic portions of the transportation. The domestic and international flight arrangements were separately made. Crown Travel reserved round trip tickets to New York from an airport near each individual's residence and arranged for each airport's prepaid ticket counter to issue the tickets, which the individuals then picked up upon presentation of identification. The domestic tickets issued concededly contained properly sized "Advice to International Passengers on Limitation of Liability."[4] LOT's tickets were issued separately, however, in New York and were picked up and paid for in a block by an AAU representative in New York the day before the ill-fated flight; these of course did not contain properly sized notice. LOT had no advance knowledge of the individual domestic travel arrangements, nor were the domestic airlines aware of the intended international flight.
 
 
 3
 Stratis presented a case that is similar in a few respects but different in others from the case(s) at bar. The similarities are as follows. Two tickets (or sets of tickets) were issued to the passenger(s), one covering the domestic leg(s), the other the international. The domestic tickets gave proper notice of Warsaw Convention liability limitations. Stratis, because he was being repatriated to Greece, "had reason to know his overall flight was international," 682 F.2d at 412, while, of course, appellees' decedents were on an international flight, LOT's, when they crashed. In both cases the travel arrangements were made by one agent. Differences include first that, while Stratis was required both by law and by arrangements with the Immigration and Naturalization Service to continue on to his foreign destination as a condition to his entry to the United States after discharge from his Greek ship, id. at 409, the appellees' decedents here were under no such legal compulsion. Second, the passenger in Stratis had filed INS Forms I-408 in order to gain entry into the United States, and that form, which listed the series of flights in question as Stratis's definite arrangements for departing the United States, id., indicated Stratis's intent to consider the flights as a single trip. Here there is no similar unequivocal document. Third, unlike the situation in Stratis where the contemplated layover between domestic and international flights was at most a matter of several hours, here the domestic flights of at least some of appellees' decedents arrived in New York twenty-four hours or more before the departure of the LOT flight. Fourth, in Stratis the Delta, Eastern, and Olympic flights appear to have been arranged in a single transaction and paid for by a single check (although the Olympic ticket had been issued for but not delivered to Stratis), id., while the domestic flights of appellees' decedents here were arranged at different times and paid for by different checks than was the LOT flight. Finally, in Stratis, Eastern Airlines, the carrier whose plane crashed, was the airline which had issued tickets that complied with the Warsaw Convention and the Montreal Agreement, whereas here the airline whose plane crashed had issued defective tickets and is seeking to limit its liability by virtue of tickets issued by other carriers.
 
 
 4
 The district court distinguished Stratis, finding that members of the AAU delegation had no "reason to know at the time they picked up their domestic tickets that they were embarking on a flight that was so integrally related to their contemplated flight to Warsaw that they had to heed the notice of limitation of liability contained in the domestic tickets." With this finding we cannot quarrel, given the first four differences between the instant cases and Stratis; since we "specifically limit[ed the Stratis ] holding to its facts," id. at 414, it is inapplicable to the facts set forth here. Thus, because the passengers in the instant case, unlike Stratis, did not regard the domestic and LOT flights "as a single operation," the flights did not constitute "one undivided transportation" within the meaning of Article 1(3) of the Convention, which states (emphasis added):
 
 
 5
 Transportation to be performed by several successive air carriers shall be deemed, for the purposes of this convention, to be one undivided transportation, if it has been regarded by the parties as a single operation, whether it has been agreed upon under the form of a single contract or a series of contracts, and it shall not lose its international character merely because one contract ... is to be performed entirely within a territory ... of the same High Contracting Party.
 
 
 6
 Consequently, the domestic flights were not "international transportation" under Article 1(1) subject to the Convention's liability limitations, and the domestic tickets' notices of limitation of liability were without legal effect. LOT seeks to avail itself of those notices in vain.
 
 
 7
 But even if Stratis were not so readily distinguishable, there is yet another reason that the domestic and LOT flights do not fit the Convention's definition of "one undivided transportation." Under Article 1(3), all parties--the successive carriers as well as the passenger--must regard the domestic and overseas flights as a "single operation." See Karfunkel v. Compagnie Nationale Air France, 427 F.Supp. 971, 974-75 (S.D.N.Y.1977); Note, Up in the Air Without a Ticket: Interpretation and Revision of the Warsaw Convention, 6 Fordham Int'l L.J. 332, 337 n. 29 (1983). Here there is every reason to suggest that none of the parties did so.[5] As a result of the separate handling of the ticket reservations, payment, issuance, and delivery for the domestic flights and the LOT flight, not only would the passengers not be likely to have considered the flights as a "single operation," though concededly there is room for doubt as to the travel agent who made the arrangements, but the carriers could not have considered that they were "successive." See 1 S. Speiser & C. Krauss, Aviation Tort Law Sec. 11.10 (1978) (separate payment and separately issued tickets indicate that the parties did not consider flights a "single operation"). LOT had no knowledge or way of knowing whether domestic tickets were issued. The domestic carriers surely did not know of the individual passengers' plans to go overseas.[6] It follows that LOT should not be able to take advantage of those domestic carriers' Warsaw notices.
 
 
 8
 This conclusion follows, in any event, from an independent argument based on another Warsaw Convention provision. Article 30(1) of the Convention subjects "each" of several successive carriers to the Convention rules. Since under Article 3(1) "the carrier" must deliver an appropriate ticket[7] and LOT did not do so, it has not abided by Article 3(1). See Manion v. Pan American World Airways, Inc., 55 N.Y.2d 398, 404 n. 1, 449 N.Y.S.2d 693, 695 n. 1, 434 N.E.2d 1060 (1982) (dicta). The treaty scheme envisions that LOT's own contract governs its relation with its passengers. Having failed itself to provide proper notice, it is precluded from benefiting by an earlier carrier's appropriate notice, even assuming that they were "successive" and that this was a "single operation."
 
 
 9
 Judgment affirmed.
 
 
 10
 Convention for the Unification of Certain Rules Relating to International Transportation by Air, opened for signature Oct. 12, 1929, adhered to by the United States June 27, 1934, 49 Stat. 3000, T.S. No. 876, reprinted in 49 U.S.C. following Sec. 1502.
 
 
 
 [2]
 Agreement Relating to Liability Limitations of the Warsaw Convention and the Hague Protocol, Agreement CAB 18900, approved by CAB Order No. E-28680, 31 Fed.Reg. 7302 (1966)
 
 
 [3]
 Judge Sifton adhered to an earlier grant of partial summary judgment to plaintiffs Bland, Robles, and Smiegel, and granted it for the first time to plaintiffs Clayton, Fulton, Stewart, Palomino, and Good. Our disposition of this appeal controls as to all other plaintiffs in this consolidated action who traveled to New York on domestic flights, including Wesson, Chavis, Radison, Lindsay, and Harris, as reflected in the caption
 
 
 [4]
 The appropriate form for "Advice to International Passengers on Limitations of Liability" appears at 14 C.F.R. Sec. 221.175 (1984)
 
 
 [5]
 Article 1(3) was discussed in Stratis but there was no mention of the "single operation" language in the opinion or in briefs. However, we alluded to the concept in footnote 8, 682 F.2d at 412, when, after referring to the fact that a "series of contracts" involving "several successive air carriers" is subject to the Convention, we went on to say
 Of course, how far this goes in time is another matter. Would a shuttle trip from Boston to New York with a contemplated week's stay in New York, to be followed by an international flight, be subject to the Convention? We are not concerned with that question here because immediate embarkation on the last leg of the trip to Athens clearly was in the parties' contemplation.
 
 
 [6]
 It may be that the same argument could have been made in Stratis by Stratis to advantage, although there was, perhaps, a certain lack of incentive on his part to explore every Warsaw avenue since his judgment also ran against the United States and the New York City Health and Hospitals Corporation. Judge Newman, for one, believed that "Eastern had no idea that Stratis was on the domestic leg of an international journey," 682 F.2d at 419 n. 7 (Newman, J., dissenting in part), notwithstanding Eastern's argument that "an international flight was contemplated by the parties," id. at 409 (majority opinion)
 
 
 [7]
 The Montreal Agreement "effectively modifies the Convention." LOT I, 705 F.2d at 88. Thus Article 3(1) incorporates the 10-point type requirement as to those carriers who entered into the Agreement or whom the Civil Aeronautics Board deems to have entered into it, see 14 C.F.R. Sec. 203.1-.5 (1984)