705 F.2d 85
 In re AIR CRASH DISASTER AT WARSAW, POLAND, ON MARCH 14,
1980, MDL 441, Polskie Linie Lotnicze (Lot Polish
Airlines), a Corporation.
Angela Y. ROBLES, Margaret Ojeda, Henryka Smiegel, Jose
Pimental, Emily Bland, Raymond E. Wesson, Patricia
Ann Chavis, Susan Janice Radison, John
Lindsay, Appellees,
v.
LOT POLISH AIRLINES, Appellant.
 No. 729, Docket 82-7616.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 18, 1983.
Decided April 8, 1983.
 
 George N. Tompkins, Jr., Condon & Forsyth, New York City (Lawrence Mentz, Desmond T. Barry, Jr., Peter A. Axelrod, of counsel), for appellant Polskie Linie Lotnicze.
 Marc S. Moller, Kreindler & Kreindler, New York City (Michael D. Young, of counsel), for appellees Robles and Ojeda.
 Frank H. Granito, Jr., Spieser & Krause, P.C., New York City (Rudolph V. Pino, Jr., of counsel), for appellees Smiegel, Pimental, Bland, Wesson, Chavis, Radison, and Lindsay.
 Before OAKES, KEARSE and SLOVITER,* Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 The Warsaw Convention[1] limits the liability of air carriers for the injury or death of international passengers. The Convention was modified in certain respects by the Montreal Agreement, which specifies that passengers must be advised of the carrier's liability limitations in 10-point type. The United States District Court for the Eastern District of New York, Charles P. Sifton, Judge, held that the use of 8.5-point rather than 10-point type to inform passengers of liability limitations stripped the appellant air carrier in this case of the protection of such limitations and prevented it from raising defenses under Article 20(1) of the Warsaw Convention. See In re Air Crash Disaster at Warsaw, Poland, on March 14, 1980, 535 F.Supp. 833 (E.D.N.Y.1982). We affirm.
 
 BACKGROUND
 
 2
 On March 14, 1980 an Ilyushin 62-M aircraft owned and operated by the appellant Polskie Linie Lotnicze (LOT Polish Airlines) (hereinafter LOT) crashed while on its final landing approach in Warsaw, Poland. The appellees are survivors of American passengers who, with one exception, boarded the flight in New York.[2] Eight of the nine decedents were affiliated with the United States Amateur Athletic Union Boxing Team and were en route to Warsaw for a tournament; the ninth decedent was the wife of the team physician. LOT concedes that the 8.5-point type "Advice to International Air Passengers on Limitations of Liability" (Advice) printed on the decedents' tickets violated the Montreal Agreement, as well as a Federal Aviation Regulation (FAR) predating the Agreement, 14 C.F.R. Sec. 221.175(a).[3] Both the Agreement and the FAR require the use of at least 10-point type; the difference between 8.5 and 10-point type, we are told by LOT, is 15/270ths of an inch, based on 72 type points to the inch. However minimal a 1.5-point difference in type size might seem, we conclude that it is enough to justify Judge Sifton's holding that the appellees in this case are not subject to the liability limitation established by the Montreal Agreement. Nevertheless, LOT is bound by its waiver under the Agreement of a defense that would otherwise be available to it under the Warsaw Convention. A brief review of the history surrounding the Convention and the Montreal Agreement is necessary to understand both LOT's arguments on appeal and our reasons for rejecting those arguments.
 
 
 3
 The Convention was drafted in Warsaw, Poland, in 1929 and became effective in February of 1933. The United States was not one of the original parties to the Convention, but it announced its intention to adhere to it in late 1934. After Senate approval and Presidential proclamation, the Convention assumed the status of a treaty, "equal in stature and force to the domestic laws of the United States." Smith v. Canadian Pacific Airways, Ltd., 452 F.2d 798, 801 (2d Cir.1971). Article 17 of the Convention[4] established a presumption of carrier liability for injuries or death sustained on the aircraft but Article 22(1) limited that liability to 125,000 francs.[5] Although a carrier could avoid liability by showing that it took "all necessary measures to avoid the damage, or that it was impossible ... to take such measures"--the so-called "all necessary measures" defense of Article 20(1)[6]--the practical effect of Article 17 was to shift the burden of proof from the passenger to the carrier. Article 17 and Article 22(1) are thus complementary, framing the trade-off embodied in the Convention. Article 3 rounds out the scheme by requiring carriers to furnish passengers with tickets stating that the transportation is subject to rules relating to liability established by the Convention.[7]
 
 
 4
 Not surprisingly, consensus as to the need for a uniform law governing air carrier liability and a passenger-carrier compromise along the lines of that effected by Article 17 and Article 22(1) did not extend to the specific monetary limitations of Article 22. Almost immediately after the Convention went into effect, several of its provisions were criticized; the "underlying and recurring theme of all the discussions was whether the limit of liability had been set at the right level." See Lowenfeld & Mendelsohn, The United States and the Warsaw Convention, 80 Harv.L.Rev. 497, 504 (1967) [hereinafter cited as 80 Harv.L.Rev.]. In 1955, at an international conference at The Hague, Netherlands, the liability limitation was doubled to 250,000 francs and what came to be known as the Hague Protocol was drafted. Id. at 509. American delegates, however, were not satisfied with either the principle of limited liability or the notice provided by the standard form used by the airlines, id. at 512-514, and sought to have the warning made both more specific and more conspicuous. The Hague Protocol's amendment of the Convention's Article 3 notice provision arguably allowed each country to establish its own notice requirements, id. at 514, and in fact in 1963 the Civil Aeronautics Board (CAB) issued a regulation requiring foreign and domestic air carriers to furnish a clear statement of liability limitations with each ticket in at least 10-point type. See note 2 supra.
 
 
 5
 The Hague Protocol was never approved by the United States, largely because of dissatisfaction with the liability limitation. Over time, opposition to the Convention and the Hague Protocol developed into a pressure for formal denunciation of the Convention by the United States. On November 15, 1965, the United States filed a Notice of Denunciation. 80 Harv.L.Rev. at 551. But the State Department indicated its willingness to withdraw the Notice before it would become effective six months later, if it appeared likely that an international agreement addressing American concerns could be reached. Id. at 551-52. Despite the threat of denunciation, delegates to the Montreal Conference held in February of 1966 failed to agree on a proposal satisfactory to the United States. Just prior to the effective date of the Denunciation, however, members of the International Air Transport Association agreed to an interim arrangement called the Montreal Agreement. The Denunciation Notice was withdrawn two days before it was to become effective, and the CAB simultaneously announced its approval of the Agreement. Id. at 586-96.
 
 
 6
 The Montreal Agreement is by its very terms a "special contract" under Article 22(1) of the Convention, which provides that a carrier and passenger "may agree to a higher limit of liability."[8] Thus, although it is actually a private agreement among carriers, it effectively modifies the Convention, at least with respect to flights departing from, arriving, or stopping over in the United States. Carriers participating in the Agreement waive the Article 20(1) "all necessary measures" defense that would otherwise be available under the Warsaw Convention, and so the Agreement imposes essentially strict liability. Carriers signing the Agreement stipulated that they would
 
 
 7
 at time of delivery of the tickets, furnish to each passenger governed by the Convention or the Protocol and by the special contract described above [the Montreal Agreement], a notice in 10 point type advising international passengers of the limitations of liability.[9]
 
 
 8
 In return for waiving the Article 20(1) defense and complying with the notice requirement set forth above, carriers receive the benefit of a liability limitation of $75,000 in most cases.
 
 DISCUSSION
 
 9
 Appellant LOT's contentions may now be understood. LOT's primary argument is that the use of 8.5- rather than 10-point type was merely a "technical and wholly insubstantial" violation of the Montreal Agreement. LOT argues that, as printed, the tickets in this case complied with the intent and purpose of the Agreement because they provided adequate notice to the decedents. In spite of the fact that the Montreal Agreement was an eleventh-hour affair that narrowly averted American denunciation of the Warsaw Convention, and in spite of the CAB regulation that preceded and surely served as the model for the 10-point requirement in the Agreement, LOT maintains that the specification of 10-point type is of no "particular significance." Brief at 22. Thus LOT maintains that the district court erred in concluding that the effect of failing to comply with the Montreal Agreement's type size requirement subjected LOT to unlimited liability, which is the lot of a carrier who "accepts a passenger without a passenger ticket having been delivered." Article 3(2). LOT's second contention is that if it is deprived of the liability limitation established under the Montreal Agreement, the entire Agreement is somehow inapplicable. Under this argument, LOT's waiver of the Article 20(1) defense under the Agreement would be deemed void, and the appellees would be entitled, at most, to the presumption of carrier liability established by Article 17 of the Convention. We reject both of these arguments.
 
 
 10
 A. Adequacy of notice. LOT of course concedes that the 8.5-point type size it used violated the Montreal Agreement as well as the CAB regulation. Nevertheless, it relies on a line of cases decided by this and other circuits construing the ticket delivery requirement of Article 3(2) of the Warsaw Convention, see note 7 supra, to support its argument that if the type size provided "adequate notice," it is still entitled to limited liability. In Mertens v. Flying Tiger Line, Inc., 341 F.2d 851, 856 (2d Cir.), cert. denied, 382 U.S. 816, 86 S.Ct. 38, 15 L.Ed.2d 64 (1965), we held that the Convention contemplated delivery "in such a manner as to afford [passengers] a reasonable opportunity to take measures to protect ... against the limitation of liability." See also Warren v. Flying Tiger Line, Inc., 352 F.2d 494, 498 (9th Cir.1965) (following Mertens ). One year after Mertens was decided, in Lisi v. Alitalia-Linee Aeree Italiane, S.p.A., 370 F.2d 508, 514 (2d Cir.1966), aff'd by an equally divided court, 390 U.S. 455, 88 S.Ct. 1193, 20 L.Ed.2d 27, reh'g denied, 391 U.S. 929, 88 S.Ct. 1801, 20 L.Ed.2d 671 (1968), we held that in order to satisfy Article 3(2)'s delivery requirement a carrier had to provide passengers with tickets containing a notice of liability limitation in a print size that was readable because otherwise the purpose of the delivery requirement of Mertens and Warren would be defeated. Lisi held a 4-point notice inadequate as a matter of law; LOT points to decisions subsequent to Lisi holding that notices printed in type sizes smaller than that at issue here provide adequate notice for Article 3(2) purposes. See, e.g., Ludecke v. Canadian Pacific Airlines, Ltd., 12 Av.Cas. 17,191 (Que.C.S.1971) (4.5-point type), aff'd in part on other grounds and rev'd in part, 53 D.L.R.3d 636 (Que.C.A.1974), aff'd on other grounds, 98 D.L.R.3d 52 (Can.1979); Millikin Trust Co. v. Iberia Lineas Aereas De Espana, S.A., 11 Av.Cas. 17,331 (N.Y.Sup.Ct.1969) (8-point type), aff'd without opinion, 36 A.D.2d 582, 317 N.Y.S.2d 734 (N.Y.App.Div.1971).
 
 
 11
 Whatever merit LOT's argument might have were we considering the adequacy of notice solely under the Warsaw Convention, the fact remains that we are not. Under the Convention, the carrier must deliver a ticket containing, inter alia, a statement referring to the liability rules. Article 3(1)(e). Under the modifying terms of the Montreal Agreement, however, that statement must be in 10-point type. Compare Husserl v. Swiss Air Transport Co., 351 F.Supp. 702, 706-07 (S.D.N.Y.1972), aff'd, 485 F.2d 1240 (2d Cir.1973) (per curiam) (looking to Montreal Agreement to determine whether hijacking was within Convention's definition of "accident"). It is simply not persuasive to argue, as LOT does, that the 10-point type requirement can be read out of the Agreement as long as 8.5-point type provides what seems to this court to be "adequate notice"; equally unavailing is the argument that 10-point type would have made little or no practical difference. It is enough that the adequacy of notice was one of the concerns that led to the filing of the Notice of Denunciation, see 80 Harv.L.Rev. at 512-14, and that the Montreal Agreement specifically addressed this concern by requiring "notice to each passenger in large type." Id. at 594. Withdrawal of the Denunciation and the CAB's acceptance of the Montreal Agreement indicates a judgment by at least the executive branch that 10-point type was necessary to provide sufficient notice, and we see no reason to dispute that determination.[10]
 
 
 12
 We also note that acceptance of the Agreement is a condition precedent to the issuance of a Foreign Air Carrier Permit under Sec. 402 of the Federal Aviation Act, 49 U.S.C. Sec. 1372 (1976 & Supp. IV 1980); 14 C.F.R. Part 211 app. 10(h) (1982). LOT acceded to the Agreement and was issued a permit accordingly. Surely it cannot now be heard to say that it should not be bound by the 10-point type size requirement. The specification of type size is as important as the requirement of delivery for Article 3(2) purposes, and LOT's failure to comply with this requirement prevents it from taking advantage of any liability limitation that it would otherwise enjoy.
 
 
 13
 LOT argues at some length in its reply brief that violation of the Montreal Agreement should not result in what it characterizes as a "treaty sanction," but this ignores the historical and functional relationship of the Agreement to the Convention. The Agreement supplements the Convention in particular respects, but Article 3(2) still imposes on carriers the duty to inform passengers of liability limitations. Failure to do so, as measured either by the terms of Article 3 or the Montreal Agreement, results in forfeiture of the limitation.[11]
 
 
 14
 Another variation on the theme that the Montreal Agreement and the Convention should be construed without reference to each other is LOT's argument that the Agreement was merely an intercarrier agreement with respect to which passengers were not intended third party beneficiaries or that, even if they were, they cannot seek a remedy not available to a contracting party.[12] This argument is sophistic. Surely the United States, when it induced the air carriers to enter the Montreal Agreement by filing the Notice of Denunciation, was not acting on its own behalf. Surely the CAB's own 10-point type size requirement and its approval of the Montreal Agreement were aimed only at the public interest. Just as certainly the purpose of the 10-point type size requirement was to give passengers " 'adequate notice' of the applicable liability limits in legible form and in understandable terms," as LOT's own brief somewhat inconsistently concedes. Brief at 22. Passengers were clearly the intended beneficiaries of a contract which specified, inter alia, the notice carriers had to provide if they were to receive the benefit of a limitation of liability. On this point we adopt Judge Sifton's discussion of the authorities and his conclusion. See 535 F.Supp. at 836.
 
 
 15
 B. Waiver of Article 20(1) defense. We also reject LOT's argument that if it is to be subject to unlimited liability under Article 3(2) of the Convention by dint of its failure to comply with the notice requirements of the Montreal Agreement, the appellees should be deprived of LOT's waiver of the Convention's Article 20(1) defense under the Agreement. LOT contends that it is "clearly inappropriate to render ineffective the limitation of liability for a technical ... defect ... and still subject the carrier to absolute liability without fault." Brief at 36.
 
 
 16
 LOT's argument is essentially one of symmetry. We are not convinced, however, that whatever burden LOT must shoulder as a result of violating the Montreal Agreement should be "balanced" by requiring the appellees to surrender some advantage they enjoy under the Agreement. We question whether, as a practical matter, LOT's position would be much improved if it were allowed to assert the Article 20(1) defense given the presumption of carrier liability under Article 17, but we would in any event resolve doubts on this score against LOT. We do so primarily because LOT alone is responsible for its failure to comply with the clear requirements of the Montreal Agreement and the CAB regulation regarding type size. Allowing LOT to shirk its duty under the Agreement and end up in no worse a position than it would be in if it had merely violated the Convention would be to ignore the fact that if the Agreement had never been drafted there would in all probability be no Convention today. See discussion supra.
 
 
 17
 Additionally, it is not clear to us that depriving LOT of liability limitations while affording the appellees the advantage of the liability rule established under the Agreement is as disruptive of the Agreement's scheme as LOT claims. To be sure, it deprives LOT of the primary benefit of the Montreal Agreement bargain, but it is not as if the appellees are receiving something for nothing. They were, after all, still subject to the other provisions of the Convention, whether or not those provisions happened to redound to LOT's benefit in this case. The history surrounding the Montreal Agreement suggests that liability without fault was the price carriers had to pay for continued international adherence to the Convention. There is no apparent reason that passengers should be deprived of this advantage because a carrier, through its failure to comply with the notice provisions, deprives itself of the benefits of limited liability.
 
 
 18
 LOT may not invoke the liability limitation of the Montreal Agreement nor the Article 20(1) defense of the Warsaw Convention.
 
 
 19
 The order for partial summary judgment is hereby affirmed.
 
 
 
 *
 Of the United States Court of Appeals for the Third Circuit, sitting by designation
 
 
 [1]
 49 Stat. 3000, TS No. 876, 137 L.N.T.S. 11, reprinted at 49 U.S.C. Sec. 1502 (1976). The Warsaw Convention is formally known as the Convention for the Unification of Certain Rules Relating to International Transportation by Air. Hereinafter, citations to the Warsaw Convention will be to its Articles
 
 
 [2]
 The various actions arising out of the crash were consolidated and transferred to the Eastern District of New York by the Joint Panel on Multidistrict Litigation pursuant to 28 U.S.C. Sec. 1407. This interlocutory appeal was certified pursuant to 28 U.S.C. Sec. 1292(b). This opinion reaches only the certified issues. We do not treat any questions pertaining to passengers like Coach Robles who flew to New York with tickets in appropriate form and apparently giving adequate notice before boarding LOT. See Stratis v. Eastern Air Lines, Inc., 682 F.2d 406 (2d Cir.1982)
 
 
 [3]
 14 C.F.R. Sec. 221.175(a) (1982), adopted in 1963, see 28 Fed.Reg. 11,777 (1963), provides in pertinent part:
 Special notice of limited liability for death or injury under the Warsaw Convention.
 (a) In addition to the aforesaid requirements of this subpart, each air carrier and foreign air carrier which, to any extent, avails itself of the limitation on liability to passengers provided by the Warsaw Convention, shall, at the time of delivery of the ticket, furnish to each passenger whose transportation is governed by the Convention and whose place of departure or place of destination is in the United States, the following statement in writing:
 ADVICE TO INTERNATIONAL PASSENGERS OF LIMITATIONS OF LIABILITY
 Passengers embarking upon a journey involving an ultimate destination or a stop in a country other than the country of departure are advised that the provisions of a treaty known as the Warsaw Convention may be applicable to their entire journey including the portion entirely within the countries of departure and destination. The Convention governs and in most cases limits the liability of carriers to passengers for death or personal injury to approximately $10,000.
 Additional protection can usually be obtained by purchasing insurance from a private company. Such insurance is not affected by any limitation of the carrier's liability under the Warsaw Convention. For further information please consult your airline or insurance company representative.
 Provided, however, That when the carrier elects to agree to a higher limit of liability to passengers than that provided in Article 22(1) of the Warsaw Convention, such statement shall be modified to reflect the higher limit. The statement prescribed herein shall be printed in type at least as large as 10-point modern type and in ink contrasting with the stock on: (1) Each ticket; (2) a piece of paper either placed in the ticket envelope with the ticket or attached to the ticket; or (3) the ticket envelope ....
 
 
 [4]
 Article 17 provides:
 The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.
 
 
 [5]
 Article 22(1) provides:
 In the transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of 125,000 francs. Where, in accordance with the law of the court to which the case is submitted, damages may be awarded in the form of periodical payments, the equivalent capital value of the said payments shall not exceed 125,000 francs. Nevertheless, by special contract, the carrier and the passenger may agree to a higher limit of liability.
 The franc refers to the French gold or "Poincare" franc, defined as 65.5 milligrams of gold at a standard fineness of 900/1000ths. Id., Art. 22(4). See Franklin Mint Corp. v. Trans World Airlines, Inc., 690 F.2d 303, 305 (2d Cir.1982).
 
 
 [6]
 Article 20(1) provides:
 The carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures.
 "Wilful misconduct" or equivalent conduct on the part of the carrier under Article 25 removes exclusions and limits of liability under Warsaw. That provision is not involved on this appeal.
 
 
 [7]
 Article 3 provides:
 (1) For the transportation of passengers the carrier must deliver a passenger ticket which shall contain the following particulars:
 (a) The place and date of issue;
 (b) The place of departure and of destination;
 (c) The agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity, and that if he exercises that right, the alteration shall not have the effect of depriving the transportation of its international character;
 (d) The name and address of the carrier or carriers;
 (e) A statement that the transportation is subject to the rules relating to liability established by this convention.
 (2) The absence, irregularity, or loss of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall none the less be subject to the rules of this convention. Nevertheless, if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those provisions of this convention which exclude or limit his liability.
 
 
 [8]
 Order of Civil Aeronautics Board Approving Increases in Liability Limitations of Warsaw Convention and Hague Protocol, summarizing Agreement CAB 18,900, reprinted at 49 U.S.C. Sec. 1502. See Order E-23,680, Docket No. 17,325 (CAB, May 13, 1966), reprinted at 31 Fed.Reg. 7302 (1966)
 
 
 [9]
 Id
 
 
 [10]
 The 10-point guideline is a clear one, and quite easy to follow. To be sure, any such line-drawing has an arbitrary air, but LOT is a party to the line drawn and it seems to us less arbitrary to accept the 10-point standard than it would be to guess on a case-by-case basis at what constitutes "adequate notice." See Travelers Indemnity Co. v. Kammer, 72 A.D.2d 817, 421 N.Y.S.2d 898 (App.Div.1979) (requiring strict compliance with state statute mandating use of 12-point type in insurance cancellation notices), aff'd, 51 N.Y.2d 792, 412 N.E.2d 1323, 433 N.Y.S.2d 98 (1980)
 
 
 [11]
 LOT argues in its reply brief that the "fallacy" of reading the Montreal Agreement or CAB notice specification into Article 3(2) of the Convention is demonstrated by the fact that Lisi indicated that notice had to be on the ticket itself, while there is nothing in the Montreal Agreement or the FAR regulation that would require this. Compare Article 3(2) ("deliver a passenger ticket which shall contain ... statement ... relating to liability") with Montreal Agreement ("at time of delivery of the tickets, furnish to each passenger ... a notice in 10 point type advising ... of the limitations of liability"). FAR 221.175(a) has, however, for 20 years provided guidance that the statement must be printed on the ticket, or on a paper attached to the ticket or placed in the ticket envelope, or on the ticket envelope. Insofar as Lisi spoke of notice being on the ticket itself, it was referring only to the requirements of the Warsaw Convention, not those of the Montreal Agreement or the FAR. And if the required type size is too large to permit printing of the notice on the ticket itself, there is nothing to prevent carriers from using larger ticket stock
 
 
 [12]
 The argument that "contracting airlines would not seek unlimited and absolute liability without fault as a remedy for a breach of the Montreal Agreement by LOT," Brief at 24, so that the passengers cannot stand in any different shoes, borders on the absurd. Restatement (Second) of Contracts Sec. 309 (1981), relied upon by LOT on this point, does not support the proposition that a third party beneficiary is not entitled to seek a remedy unavailable to a contracting party
 The argument that "technical violation of a regulation does not give rise to a quasi-implied private right of action" to the passengers, Brief at 24 n. 12, relying on Touche Ross & Co. v. Redington, 442 U.S. 560, 571, 99 S.Ct. 2479, 2486, 61 L.Ed.2d 82 (1979), totally misses the point. A right of action is not what is involved in the type size provision; plaintiffs already have that. What is involved is whether Warsaw-modified-by-Montreal limitations of liability or Warsaw Article 20 defenses to that right are available.